1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

8
9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| MARIO ARCIGA, | No.  1:15-cv-01372-DAD-JLT (HC) |
| Petitioner, | **FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| SCOTT FRAUENHEIM, Warden, | **[TWENTY-ONE DAY OBJECTION DEADLINE]** |
| Respondent. | |

11
12
13
14
15
16

17        In 2012, Petitioner was sentenced to 25 years-to-life plus 19 years for his convictions on

18 charges of forcible rape, kidnapping to commit rape, attempted lewd act on a child, and attempted

19 kidnapping to commit a lewd act.  In this action, Petitioner claims the trial court erred in refusing

20 to sustain his Batson/Wheeler challenge and that there was insufficient evidence to support all of

21 his convictions and the enhancement.  The Court disagrees and recommends the petition be

22 **DENIED.**

23 **I.        PROCEDURAL HISTORY**

24        Petitioner was convicted in the Fresno County Superior Court on January 17, 2012, of

25 forcible rape (Cal. Penal Code § 261(a)(2)), kidnapping to commit rape (Cal. Penal Code §

26 209(b)(1)), attempted lewd act on a child (Cal. Penal Code §§ 664/228(a)), and attempted

27 kidnapping to commit a lewd act (Cal. Penal Code §§ 664/209(b)(1)).  (Pet. at 1.)  He is currently

28 serving an indeterminate sentence of 25 years-to-life plus 19 years.  Id.

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"). The Fifth DCA affirmed the judgment on April 11, 2014. (Resp't's Answer, Ex. A.) Petitioner then filed a petition for review in the California Supreme Court. The petition was summarily denied on June 25, 2014. (Pet. at 2.)

## II.    FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[1]:

M.F. walked along a dirt road beside some railroad tracks in Fresno shortly before noon on August 18, 2010, heading for a bus stop. Arciga drove up to her in a pickup truck. He stopped 10 to 15 feet away and lunged out, hitting her on the head as he did so. He wore a black ski mask with holes for his eyes and mouth. She fell to the ground and screamed. He put his hand over her mouth, saying he would hit her again if she continued screaming. He lifted her shirt and bra and put his mouth on her breast. She asked what he wanted. He wanted sex. He raised her from the ground, took her to the truck, and put her inside. Fearing he would hurt or kill her, she did not try to escape. As M.F. sat on the seat, Arciga pulled her shorts and underwear off, unbuttoned his pants, and pulled out his penis. Then he lay on top of her, pinned her arms to her sides with his, and placed his penis inside her vagina. She freed a hand and tried to remove the ski mask, but he prevented her. When he was finished, he put his penis back in his pants and said "thanks." M.F. put her shorts back on, got out of the truck and walked away. As Arciga drove away, M.F. typed the truck's license plate number into her cell phone. She then walked across a field to a strawberry stand and called 911.

Around 8:00 a.m. the next day, August 19, 2010, 12–year–old C.M. was walking to school. As she approached the school, Arciga drove up in a truck and got out, wearing a black ski mask and holding a gun. He approached within four or five feet and told her to get in the truck. She said no, because she was going to be late for school. Arciga told her to take off her shirt. C.M. said no again. She backed up against the schoolyard fence, afraid Arciga would rape or kill her. He kept repeating his order to get in the truck, with the gun pointed at her, but she gave him the same answer. After 5 or 10 minutes, Arciga got back in the truck and left. C.M. went to the school entrance and reported the attack to a security guard.

Based on C.M.'s description of the truck, police pulled Arciga over and arrested him the same morning. Inside the cab of the truck were an air pistol and a black ski mask.

For purposes of DNA testing, samples were taken from M.F., Arciga, and a stain on the seat of a pickup truck. M.F. had identified the truck. DNA from sperm cells found in M.F.'s vagina matched Arciga's DNA profile. The truck seat stain contained DNA matching the profiles of both M.F. and Arciga.

The district attorney filed an information charging Arciga with four counts: (1) forcible rape (Pen.Code, § 261, subd. (a)(2));1 (2) kidnapping to commit rape (§

---

[1] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts. <u>Moses v. Payne</u>, 555 F.3d 742, 746 (9th Cir. 2009).

209, subd. (b)(1)); (3) attempting to commit a lewd act against a child (§§ 288, subd. (a), 664); and (4) attempting to kidnap a child to commit a lewd act (§§ 209, subd. (b)(1), 664). For count 1, the information alleged the special circumstance that Arciga kidnapped the victim. (§ 667.61, subds. (a), (c)(1), (d)(2).) For counts 3 and 4, the information alleged that Arciga used a deadly weapon. (§ 12022.3, subd. (a).)

At trial, Arciga's defense was that he and M.F. had been dating for two months on August 18, 2010, and that she had consensual sex with him at his house that day. He admitted that he parked his truck near C.M.'s school on August 19, 2010, but denied he confronted C.M. or tried to make her get in the truck. M.F. testified that she had never met Arciga before he raped her.

The jury found Arciga guilty as charged and found the kidnapping and weapon-use allegations true. For count 1, the court imposed a sentence of 25 years to life. For count 4, the court imposed a sentence of 9 years, plus 10 years for the weapon enhancement. Sentences for counts 2 and 3 were imposed and stayed pursuant to section 654. The total unstayed sentence was an indeterminate term of 25 years to life plus a determinate term of 19 years.

People v. Arciga, No. F064382, 2014 WL 1400962, at *1–2 (Cal. Ct. App. Apr. 11, 2014), review denied (June 25, 2014).

## III.   DISCUSSION

### A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

### B.   Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

3

the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of  the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  Harrington, 131 S.Ct. at 787-788.

The second prong pertains to state court decisions based on factual findings.  Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500.  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Id.; see

1  Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543
2  U.S. 1038 (2004).

3      To determine whether habeas relief is available under § 2254(d), the federal court looks to
4  the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.
5  Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.
6  2004).  "[A]lthough we independently review the record, we still defer to the state court's
7  ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

8      The prejudicial impact of any constitutional error is assessed by asking whether the error
9  had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.
10 Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120
11 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error
12 and reviewed it for harmlessness).

13      C.    Review of Claims

14      The this action, Petitioner claims: 1) He was denied his rights under the Fourteenth
15 Amendment to the Constitution when the trial court found that he had not made a prima facie case
16 of purposeful racial discrimination by the prosecution in its exercise of peremptory challenges; 2)
17 He was denied his rights under the Fourteenth Amendment to the Constitution when a kidnapping
18 enhancement was imposed, and he was convicted of aggravated kidnapping, based on insufficient
19 evidence; and 3) He was denied his due process rights under the Fourteenth Amendment when he
20 was convicted of attempted kidnapping to commit a lewd act based on insufficient evidence.

21      *1.*    Batson/Wheeler Challenge

22          a.    State Court Opinion

23      Petitioner contends the trial court violated Petitioner's due process rights when it denied
24 defense counsel's Batson/Wheeler[2] motion, finding defense counsel had failed to make a prima
25 facie case of purposeful racial discrimination in its exercise of peremptory challenges.  The claim
26 was presented on direct appeal to the Fifth DCA, where it was rejected in a reasoned decision.

27  _____

28  [2] Batson v. Kentucky, 476 U.S. 79 (1986); People v. Wheeler, 22 Cal.3d 258 (1978).

The appellate court rejected the claim as follows:

Arciga maintains that the trial court erred when it denied his motion under *Wheeler* and *Batson*. As we will explain, the record supports the trial court's decision.

In 1978, the California Supreme Court held that the California Constitution prohibits the exercise of peremptory challenges on the basis of group bias in a criminal case. (*Wheeler, supra*, 22 Cal.3d at p. 276.) "[T]he use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community...." (*Id.* at pp. 276–277.) In 1986, the United States Supreme Court similarly held that the equal protection clause of the 14th Amendment "forbids the prosecutor to challenge potential jurors solely on account of their race...." (*Batson, supra*, 476 U.S. at p. 89.)

A defendant can raise the *Wheeler/Batson* issue by making a motion in the trial court. To prevail, the defendant must first establish a prima facie case "'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" (*Johnson v. California* (2005) 545 U.S. 162, 168 [quoting *Batson*] (*Johnson*).) It is not necessary at this stage for the defendant to show that the peremptory challenges at issue were more likely than not based on a discriminatory purpose. The defendant's showing need only raise an inference of such a purpose. (*Ibid.*) Next, the burden shifts to the prosecution to produce race-neutral reasons why jurors have been excluded. Finally, on the basis of both sides' submissions, the trial court must decide whether purposeful discrimination has been shown. (*Ibid.*)

In the process of selecting the 12 regular jurors in this case, the court reached the 56th name on the random juror selection sheet. Of this group, four received hardship deferrals. Of the remaining 52, 18 had Spanish surnames. The prosecution exercised 15 peremptory challenges, of which 10 were used to excuse prospective jurors with Spanish surnames. The defense exercised peremptory challenges to excuse four other prospective jurors with Spanish surnames. An additional two were excused for cause. Two remained who were seated on the jury. To summarize, 34.6 percent of the panel from which the jury was selected had Spanish surnames; the prosecution used 66.7 percent of its peremptory challenges to excuse those with Spanish surnames; and 16.7 percent of the jurors that were seated had Spanish surnames.

After jury selection was complete, the court made a record of a *Wheeler/Batson* motion the defense had made during a break. The court denied the motion:

> "We remain on the record. The record should reflect at one of our breaks when I believe when we were going back to challenges for cause, Mr. Criego [defense counsel] raised a *Batson–Wheeler* motion. He made the motion formally. I will now document that motion. I ruled then, and regardless of whatever point it was in the trial, I believe it was after the exercise of [a peremptory challenge excusing prospective juror number 24]—but it may have been later than that—but whatever stage it was, I considered it to be [an] ongoing motion.

> "I'm ruling at this point there has not been a showing of a prima facie case of exclusion. I recognize that of the 15 jurors excused by the defense [sic, prosecution], a significant portion bore Hispanic surnames; however, I did my best to keep track and keep notes. Based upon those jurors' answers, it

does appear that none—there was not a pattern of discrimination based upon the racial makeup of the jurors standing alone.

"There has been no showing that the People exercised their peremptory challenges in a racially discriminatory manner. I won't even ask the People to make a response, but I have independently based upon my notes, feel and rule that there has been no showing made."

Arciga contends that a prima facie case was established and that the trial court therefore erred in not requiring the prosecution to proffer nondiscriminatory reasons for its peremptory challenges. He asks us either to reverse and remand for a new trial or to reverse and remand with instructions to the trial court to proceed with the next stage of the *Wheeler/Batson* inquiry and order a new trial if appropriate.

In *Johnson, supra*, 545 U.S. at page 169, the United States Supreme Court reiterated the test for a prima facie case established in *Batson*. That test is as follows:

"[A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant must first show that he is a member of a cognizable racial group [citation], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' [Citation.] Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." (*Batson, supra*, 476 U.S. at p. 96.)

In this case, it is undisputed that Arciga is a member of a cognizable racial group and that the prosecutor exercised 10 peremptory challenges to excuse potential jurors who belonged to the same group. The only question is whether Arciga showed that, in light of these and the other relevant circumstances, an inference existed that the prosecutor removed those potential jurors on account of their race.

The parties disagree about the standard under which we review a trial court's determination that a defendant has failed to support a *Wheeler/Batson* motion by making a prima facie case of discrimination. Arciga maintains that we are to review this question de novo. The People contend that we should review the record only for substantial evidence supporting the trial court's decision. Both sides cite case law in support of their view. (*People v. Streeter* (2012) 54 Cal.4th 205, 222 [reviewing record independently "to resolve the legal question whether the record supports an inference that the prosecutor excused a juror on the basis of race"] (*Streeter*); *People v. Lenix* (2008) 44 Cal.4th 602, 613 ["Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions."].) Our Supreme Court has, however, recently reaffirmed the following specific description of the review we are to undertake in a case like this one:

"'"When a trial court denies a *Wheeler* motion without finding a prima facie case of group bias, the appellate court reviews the record of voir dire for evidence to support the trial court's ruling. [Citations.] We will affirm

7

the ruling where the record suggests grounds upon which the prosecutor might reasonably have challenged the jurors in question." [Citation]' [Citation]." (*People v. Pearson* (2013) 56 Cal.4th 393, 421 (*Pearson*.)

In *Pearson*, a capital case, the court examined the voir dire transcript for the excused prospective juror at issue. It recited several facts about her—that she would find it hard to vote for the death penalty because of her religious beliefs, that she was acquainted with the prosecutor and a defense witness, and other facts—each of which "would provide an adequate reason other than racial discrimination to support the prosecutor's challenge." This analysis demonstrated that the trial court did not err in finding that the defendant failed to present a prima facie case. (*Pearson, supra*, 56 Cal.4th at p. 422.)

We turn, therefore, to the voir dire transcript to seek evidence of grounds upon which the prospective jurors might reasonably have been challenged. The 10 Spanish-surnamed prospective jurors excused by the prosecution were numbers 1, 8, 15, 25, 28, 32, 41, 46, 48, and 56. As will be seen, we hold that there were adequate reasons other than racial discrimination for each challenge.

Prospective Juror No. 1 testified that she had been arrested on a misdemeanor child endangerment charge. She felt the authorities treated her well on that occasion. She was unmarried, unemployed, and a high-school dropout. She spent her spare time with her son and looking for work. The prosecution could reasonably have challenged prospective Juror No. 1 on the basis of these facts. A person with a record of arrest for endangering a child might have a less-protective attitude toward children, such as the child victim in this case, than some other people. A person with a low education level might be regarded as less likely to understand and correctly apply the law.

Prospective Juror No. 8 was a college student, unmarried, and childless. He testified about an encounter he and his father had with two deputy sheriffs after an accident involving a golf cart. One deputy was "really nice," but the other was "just a jerk" and called the father a jackass. Prospective Juror No. 8 said he would be able to put this experience aside and be impartial, yet the experience was "still like in the back of my mind." The prosecutor could reasonably conclude that this juror was more likely than others to mistrust police testimony. The prosecutor also could reasonably factor in the juror's childlessness as possibly making him less sympathetic to the child victim than a parent might be.

Prospective Juror No. 15 was engaged in postgraduate study and was employed in a school district's migrant education program. The prosecutor asked her, "[I]f you saw a rape victim testify and they did not cry on the stand, they did not fall apart on the stand, are you automatically going to say, well, I can't believe anything she says?" The transcript indicates that prospective Juror No. 15's response was a nod. The prosecutor then said, "No? Okay. So how a rape victim reacts is very different." Because the juror's response was ambiguous and the prosecutor's follow up did not yield any clarification, the prosecutor could reasonably be concerned that the juror would be more likely than others to disbelieve an unemotional victim witness. If the juror failed to understand the question, the prosecutor might reasonably have been concerned about the juror's possible lack of attentiveness.

Prospective Juror No. 25 was an accountant. The prosecutor explained that she had a brother who was an accountant, and she had a "concern" that the juror's profession might mean he had a "personality thing" that would demand absolute certainty and prevent him from properly applying the reasonable doubt standard.

The juror replied that he did not use the standards applicable to his work in everyday life and would be able to follow the court's instructions. Prospective Juror No. 25 also testified that his father was once arrested for possession of narcotics for sale. The juror believed his father was treated fairly by the prosecution and the court and adequately represented by defense counsel. The father's case was dismissed. In our view, the prosecutor could reasonably believe, despite the juror's assurance that he did not feel there was any unfairness in his father's case, that the juror might harbor resentment against law enforcement. The prosecutor also could reasonably feel, again in spite of the juror's assurances, that the juror's profession might make him more likely than others to demand greater certainty than the law requires for conviction.

Prospective Juror No. 28 had passed the GED exam and received a high school equivalency credential. He worked at a coffee house and was unmarried and childless. The prosecutor could reasonably take account of his lower education level, particularly in light of the fact that the trial would include scientific testimony regarding DNA evidence. The prosecutor also could take account of the juror's unmarried and childless state, as this could be an indication that the juror might lack understanding of a female witness's potential lack of emotion while testifying.

Prospective Juror No. 32 was a registered nurse employed at a hospital. She raised her hand and told the court, "I don't think I can judge appropriately just because of my personality and I have a hard time judging if I judge correctly or not." Later, when defense counsel asked if anyone believed he or she should not be a juror, prospective Juror No. 32 again raised her hand and said, "Again, real opinion on this case, I just don't feel like I would want to be responsible for judging." Upon further questioning by defense counsel, the juror said she could "be open minded on both sides" but still maintained that "that's going to be difficult for me because I just—my personality—because my personality...." Defense counsel interrupted and asked further questions, after which the juror finally said she could be fair and did not believe she should be excused. The juror had a brother who had been arrested and spent a few days in jail for driving under the influence. She felt he was treated fairly. The prosecutor could reasonably conclude that this juror had no confidence in her ability to reach a verdict in this case and only said otherwise in the end because of defense counsel's insistent questioning. The prosecutor also could reasonably take account of the juror's experience of a family member being arrested and incarcerated.

Prospective Juror No. 41 had a felony charge pending in Madera County. He felt he was being treated fairly. The prosecutor could reasonably believe the juror's perception of law enforcement and the criminal process could be colored, to the prosecution's detriment, by the juror's own experience of being prosecuted. She also could reasonably believe the juror would be preoccupied during the trial by the question of his own future.

Prospective Juror No. 46 was a special education teacher and was working on a master's degree in special education. She was engaged to be married and was childless. She requested a hardship deferral because her graduate school classes were set to begin on what the court had said would probably, but not necessarily, be the last day of trial. The court denied her request, saying it would excuse her and use an alternate at that time if necessary. The prosecutor could reasonably conclude that this juror might be preoccupied by the possibility that the trial would end up conflicting with the start of classes and might be distracted by the thought that if she were excused at the end of the trial, several days of her time would have

been wasted. The prosecutor also could, again, factor in the juror's childlessness.

Prospective Juror No. 48 was married and had children, was unemployed, and "[j]ust barely went to high school." His car was burglarized twice in six months and he was frustrated that the police declined to come investigate. When asked whether, as a result, he would be critical of law enforcement in this case, he said, "I don't think so." The prosecutor could reasonably believe that this juror was more likely than others to be influenced by resentment toward police officers. The prosecutor could, once again, also consider the juror's limited education.

Prospective Juror No. 56 testified that he was not arrested but "detained" in Los Angeles five months earlier. While at an establishment on Sunset Boulevard, he stepped outside for "some fresh air." Some police officers took and searched his wallet and made him get in the back of a police car before releasing him. He said the incident "[l]eft me kind of upset." When asked whether it would affect his ability to be fair and impartial, he said, "I hope not." The prosecutor could reasonably conclude that this juror would be more likely than others to resent and mistrust police officers and therefore would be less likely to believe police testimony.

In light of the foregoing, we hold that the record of voir dire contains grounds upon which the prosecutor could reasonably challenge these 10 prospective jurors.

Arciga cites federal appellate decisions stating that "comparative juror analysis" is appropriate in determining whether a prima facie case was made. (*E.g., Boyd v. Newland* (9th Cir.2006) 467 F.3d 1139, 1148.) Comparative juror analysis means a comparison of the jurors challenged with those of another race who were not challenged, with the goal of determining whether the prosecutor could really have been concerned with the issues that might have supported the challenges. As Arciga acknowledges, however, our Supreme Court has repeatedly held that comparative juror analysis is not an appropriate part of our review of the prima-facie-case issue. (*Streeter, supra,* 54 Cal.4th at p. 226, fn. 5; *People v. Taylor* (2010) 48 Cal.4th 574, 616–617; *People v. Hawthorne* (2009) 46 Cal.4th 67, 80, fn. 3, *overruled on other grounds by People v. McKinnon* (2011) 52 Cal.4th 610, 637–638.) Consequently, we will not discuss that issue further.

Next, Arciga argues that the trial court erred when it referred to the absence of a "pattern" of racial discrimination in the prosecutor's use of peremptory challenges. This argument is based in part on a misunderstanding of the authority Arciga cites. In one passage in *Johnson, supra,* 545 U.S. at page 169, footnote 5, cited by Arciga, the United States Supreme Court reiterated the holding of *Batson* that a prima facie case can be established on the basis of the facts in the defendant's own case, as opposed to a pattern of prosecutorial action across multiple cases. The trial court here plainly was not referring to that kind of pattern.

It is true, however, that a single instance of a peremptory challenge motivated by a discriminatory intent is unconstitutional; there need not be a pattern consisting of more than one such challenge within a defendant's own case. (*Snyder v. Louisiana* (2008) 552 U.S. 472, 478.) Yet we do not think the experienced trial judge who presided in this case believed a small number of racially discriminatory challenges, or a single racially discriminatory challenge, would have been acceptable. The court stated that it had kept track of the individual jurors' answers and in light of those answers found no prima facie case of discrimination. This indicates that the court was monitoring the voir dire of each prospective juror for signs of improper challenges. We conclude that the court did not apply an erroneous standard,

10

1    despite its use of the word "pattern."

2    Finally, Arciga asserts that the percentages alone—the prosecutor used 66.7
     percent of her peremptories against a group comprising only 34.6 percent of the
3    panel from which the jury was selected—established a prima facie case. There is,
     however, no rule that a prima facie case is established whenever a given threshold
4    of disparity is crossed. Instead, the rule is that, even if a statistical disparity exists,
     a ruling of no prima facie case should be affirmed if the "record suggests that the
5    prosecutor had ... race neutral reasons" for excusing the jurors. (*Pearson, supra*, 56
     Cal.4th at p. 422.) In *Pearson*, the reasons in the record supporting the challenge at
6    issue were sufficient to support the trial court's finding of no prima facie case even
     though the prosecutor used 50 percent of his peremptory challenges against
7    African–American prospective jurors, where only 12.5 percent of the prospective
     jurors were African–American. (*Ibid.*) This case is comparable. (*See also Streeter*,
8    *supra*, 54 Cal.4th at p. 223 [no prima facie case even though prosecutor used 60
     percent of peremptories to excuse African–American prospective jurors who
9    comprised only 28 percent of those called to jury box during voir dire].)

10   For all these reasons, we conclude that the trial court did not err when it found that
     Arciga failed to establish a prima facie case in support of his *Wheeler/Batson*
11   motion.

12   *Arciga*, 2014 WL 1400962, at *2–7.

13          b.      Federal Standard

14          Racial discrimination by the state in jury selection offends the Equal Protection Clause.

15   Miller–El v. Dretke, 545 U.S. 231, 238 (2005).  A criminal defendant is denied equal protection

16   of the law if he is indicted by a grand jury or tried by a petit jury from which members of his race

17   have been excluded because of their race.  Eubanks v. Louisiana, 356 U.S. 584, 585 (1958).

18   Purposeful discrimination on the basis of race or gender in the exercise of peremptory challenges

19   violates the Equal Protection Clause of the United States Constitution.  See Batson v. Kentucky,

20   476 U.S. 79, 85 (1986); Johnson v. California, 545 U.S. 162 (2005). A defendant, however, has

21   no right to a "petit jury composed in whole or in part of persons of his own race."  Batson, 476

22   U.S. at 85 (quoting Strauder v. West Virginia, 100 U.S. 303, 305 (1879)).  Rather, a defendant

23   has the right to be tried by a jury whose members are selected pursuant to nondiscriminatory

24   criteria.  Id. at 85–86 (citing Martin v. Texas, 200 U.S. 316, 321 (1906)).

25          A Batson challenge involves a three-step analysis:

26   First, the movant must make a prima facie showing that the prosecution has
     engaged in racially discriminatory use of a peremptory challenge.  Second, once
27   the trial court decides a prima facie case has been established, the burden shifts to
     the prosecutor to articulate a race-neutral explanation for the challenges.  Third,
28   the trial court must determine whether the defendant has established purposeful

                                          11

discrimination.  If the defendant fails to establish a prima facie case, the burden does not shift to the prosecution, and the prosecutor is not required to offer an explanation for the challenge.

Tolbert v. Gomez, 190 F.3d 985, 987-88 (9th Cir.1999) (internal citations omitted).

In order to establish a prima facie case of discrimination, the defense must show: (1) the defendant is a member of a cognizable racial group; (2) the prosecution has removed members of such a racial group; and (3) circumstances raise an inference that the challenges were motivated by race.  Batson, 476 U.S. at 96.

c.    Analysis

In this case, the defense established the first two requirements of a prima facie case for discrimination, i.e., Defendant is Hispanic and the prosecution removed ten prospective jurors with Spanish surnames.  As noted above, however, the trial court found that there were no circumstances raising an inference that the challenges were motivated by race.  To establish such an inference, the defense need not have shown that the prosecution engaged in "a pattern of discriminatory strikes against more than one prospective juror."  United States v. Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir.1994).  The striking of only one prospective juror with discriminatory purpose violates the Constitution.  Id.  Nevertheless, the striking of one juror of a cognizable racial group does not by itself raise an inference of discriminatory purpose.  Id.  Instead, the trial court must consider the totality of relevant circumstances.  Id.; United States v. Chinchilla, 874 F.2d 695, 698 (9th Cir. 1989).  "The trial judge, experienced in supervising voir dire, is in the unique position of observing the voir dire firsthand, as well as the prosecutor's questions and statements during examination, an activity that may support or refute an inference of discriminatory motive."  Tolbert, 190 F.3d at 988 (citing Batson, 476 U.S. at 97).

Petitioner claims the trial judge used an incorrect standard by looking for a "pattern" of discrimination.  However, the appellate court made a factual determination that the trial judge, despite his use of the word "pattern," considered the totality of the circumstances, and the record supports the state court determination.  The trial judge noted that he relied upon his notes and independently considered each juror.  The trial judge also stated that he considered the defense Batson challenge as ongoing, which shows the judge looked at each voir dire for discriminatory

1   motive.  Thus, Petitioner fails to rebut the presumption that the state court finding was correct.

2   28 U.S.C. § 2254(e)(1).

3          In addition, the appellate court looked to the entire voir dire transcript and determined that

4   the record supported race-neutral reasons for each of the prosecution's challenges.  The court

5   noted that Prospective Juror #1 had a record of child endangerment and therefore might have a

6   less-protective attitude toward a child than others.  Prospective Juror #8 testified that an officer

7   had been a "jerk" to him in a previous encounter with law enforcement, and the experience was

8   "still like in the back of my mind."  The court concluded that the prosecutor could reasonably

9   have believed the juror would be more likely to distrust police testimony.  Prospective Juror #15

10  responded in a vague manner when repeatedly asked about how she perceived an unemotional

11  rape victim.  The court found the prosecutor could have been concerned with the juror's

12  perception of a rape victim witness, or the juror's possible lack of attentiveness.  The court found

13  that the prosecutor could have believed Prospective Juror #25 might have harbored resentment

14  against law enforcement, or that the juror's profession might have made it more likely to demand

15  greater certainty than the law required for conviction.  Prospective Juror #28 was less educated,

16  unmarried and childless.  The court found that the prosecutor could have concluded that the juror

17  did not possess sufficient education, or that the juror's childless and unmarried state could

18  indicate a lack of understanding for a female witness's lack of emotion while testifying.

19  Prospective Juror # 32 testified that she had trouble making decisions and did not want to be

20  responsible for judging.  The court determined that this was sufficient reason in itself for

21  challenge.  Prospective Juror # 41 had a pending felony charge in another county.

22         The court concluded that the prosecutor could have been concerned that the juror's view

23  of law enforcement and the criminal process could be colored to the prosecution's detriment, or

24  that the juror would be preoccupied with his ongoing case.  Prospective Juror #46 requested a

25  hardship deferral because her graduate school classes were set to begin on the possible last day of

26  trial.  The trial court denied her request.  The appellate court found that the prosecutor may have

27  been concerned that the juror would be preoccupied by the possibility the trial would end up

28  conflicting with her classes.  Prospective Juror #48 had expressed frustration with law

1    enforcement's response to his reports of burglaries.  When the juror was asked whether he would

2    be critical of law enforcement, he stated, "I don't think so."  The court concluded that the

3    prosecutor could have been concerned that the juror would be biased against law enforcement.

4    Finally, Prospective Juror # 56 described a recent involvement with law enforcement that "left

5    [him] kind of upset."  The court concluded that the prosecutor could have been concerned that

6    this juror would also be biased against law enforcement.

7        Based on its review, the state court found race-neutral reasons for each challenge.  The

8    court reasonably concluded that the trial judge did not err when it did not find an inference of

9    purposeful racial discrimination.  Petitioner argues that the statistics alone provide an inference of

10   purposeful discrimination; however, the Court is not aware of any Supreme Court authority which

11   holds that statistics alone can provide a prima facie case.  Even if that were the case, fair-minded

12   jurists could differ on whether the statistics here would be sufficient.  In his traverse, Petitioner

13   argues that the trial court's determination should be rejected because the court failed to conduct a

14   comparative juror analysis.  The argument is without merit, because a comparative analysis only

15   comes into play at the third step of the Batson analysis.  Miller-El v. Dretke, 545 U.S. 231, 240-

16   41 (2005).  As discussed above, the third step was never reached in this case because the trial

17   court did not find a prima facie case of purposeful discrimination.  As to that determination,

18   Petitioner fails to demonstrate that no fair-minded jurist would agree with the state court's

19   conclusion.  The claim should be rejected.

20        *2.*    Insufficiency of the Evidence – Kidnapping of M.F.

21            a.    State Court Opinion

22        Petitioner alleges there was insufficient evidence to support the second count of

23   aggravated kidnapping and the special circumstance of kidnapping attached to the rape offense.

24   This claim was also presented on direct appeal to the Fifth DCA, where it was rejected as follows:

25        Arciga maintains that there was insufficient evidence to support the conviction on
         count 2, kidnapping to commit rape, or the true finding on the kidnapping special
26       circumstance charged in connection with count 1, rape. He says the evidence did
         not show he kidnapped M.F., since it was undisputed that he only moved her 10 to
27       15 feet from the dirt road to the cab of the truck. We conclude that this movement
         was sufficient to support the jury's findings.
28

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] When reviewing the sufficiency of evidence to support a special circumstance, the relevant inquiry is "'whether, after viewing the evidence in the light most favorable to the People, any rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt.'" [Citations.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

Proof of the kidnapping circumstance requires a showing that the defendant kidnapped the victim and "the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense...." (§ 667.61, subd. (d)(2).) The elements of the kidnapping portion of the offense of kidnapping to commit rape are similar: "[T]he movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (§ 209, subd. (b)(2).) This provision requires lesser proof than section 667.1, subdivision (d)(2), because it does not call for a substantial increase in the risk of harm. Consequently, if the movement did substantially increase the risk of harm to M.F. over the risk inherent in rape and was not merely incidental to the rape, then both the kidnapping circumstance in count 1 and the kidnapping element of the offense in count 2 were established.

Our Supreme Court has held that factors relevant to a substantial increase in the risk of harm include decreased likelihood of detection, danger inherent in a victim's foreseeable efforts to escape, and the defendant's enhanced opportunity to commit additional crimes. (*People v. Vines* (2011) 51 Cal.4th 830, 870.)

The jury could reasonably find that moving M.F. from the road to the truck was not merely incidental to the rape and substantially increased the risk of harm to her. By placing M.F. on her back on the truck's seat and then obstructing the doorway with his body, Arciga reduced the likelihood that the attack would be seen and stopped by passersby, increased the difficulty and danger involved in any possible escape attempt by M.F., and placed M.F. more completely within his control. Arciga greatly enhanced the potential for removing M.F. from the scene and inflicting further harm on her by forcing her into a vehicle. There is no question that a rape victim who has been forced into a vehicle faces an increased threat to her life and safety beyond that faced by a victim raped outside on the ground.

This conclusion is supported by *People v. Diaz* (2000) 78 Cal.App.4th 243, 248–249. Diaz accosted his victim on a sidewalk in Los Angeles. He forced her to the ground on a grassy area beside the sidewalk and got on top of her. A passerby in a car saw this and said something. Diaz then forced the victim into a park and behind a closed building, where he sexually assaulted her. This was at least 150 feet from the place where he found her. The Court of Appeal held that the jury

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

properly found the movement of the victim into the park and behind the building was not incidental to the assault and substantially increased the risk to the victim. The initial move from the sidewalk to the grass beside it "could easily be characterized as incidental, in that it effected no substantial change in the surroundings...." (*Id.* at p. 249.) The movement into the park and behind the building, by contrast, "dramatically changed the environmental context." (*Id.* at p. 248.) Further, "the risk to the victim in the dark and isolated location of the attack increased significantly as compared to the lighted sidewalk near the bus stop where the incident began." (*Id.* at p. 249.) Here, similarly, an attack beside the road might not have supported the kidnapping aspects of the verdict, but the movement into the truck was a significant, nonincidental change in surroundings that made the situation substantially more dangerous for M.F.

Arciga, 2014 WL 1400962, at *7–8.

      b.    Federal Standard

The law on sufficiency of the evidence is clearly established by the United States Supreme Court. Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is as follows: "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990). Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

16

1        In <u>Cavazos v. Smith</u>, __U.S. __, 132 S.Ct. 2 (2011), the United States Supreme Court

2   further explained the highly deferential standard of review in habeas proceedings, by noting that

3   <u>Jackson</u>,

4        makes clear that it is the responsibility of the jury - not the court - to decide what
     conclusions should be drawn from evidence admitted at trial. A reviewing court

5        may set aside the jury's verdict on the ground of insufficient evidence only if no
     rational trier of fact could have agreed with the jury. What is more, a federal court

6        may not overturn a state court decision rejecting a sufficiency of the evidence
     challenge simply because the federal court disagrees with the state court. The

7        federal court instead may do so only if the state court decision was "objectively
     unreasonable."

8
     Because rational people can sometimes disagree, the inevitable consequence of

9        this settled law is that judges will sometimes encounter convictions that they
     believe to be mistaken, but that they must nonetheless uphold.

10

11  <u>Id</u>. at 3.

12            c.      <u>Analysis</u>

13       Petitioner contends that the movement of victim M.F. from the road and into the truck was

14  insufficient to support the substantive offense of kidnapping with intent to rape or the special

15  circumstance of kidnapping.  He argues that the distance of ten to fifteen feet was negligible and

16  the difference in location did not increase the risk of harm to the victim.  As noted above, the

17  appellate court rejected Petitioner's claim and found sufficient evidence supported the kidnapping

18  special circumstance.  This Court agrees.

19       While the distance Petitioner moved the victim was short, there is no question that the

20  movement of the victim into the truck increased the risk of harm to the victim.  The victim was

21  placed on her back on the truck's seat, and Petitioner stood at the doorway thereby placing

22  Petitioner in complete control of the victim and preventing any possible escape.  By taking this

23  position, Petitioner reduced the likelihood that any passerby would be alerted to the rape.  In

24  addition, the victim faced even more danger with the possibility of being driven away in the

25  vehicle and having further harm inflicted upon her.  In light of these facts, the state court

26  reasonably found that there was more than sufficient evidence supporting the finding that the

27  victim was moved in such a way as to "substantially increase[] the risk of harm to the victim over

28  and above that level of risk necessarily inherent in the underlying offense."  Cal. Penal Code §

667.61(d)(2).  The state court's finding was not contrary to, or an unreasonable application of, controlling Supreme Court authority.  The claim should be rejected.

In addition, the substantive offense of aggravated kidnapping in Count 2 requires an even lesser showing with respect to the element of kidnapping, since aggravated kidnapping does not require a "substantial increase" in the risk of harm.  Since the evidence supports a substantial increase in the risk of harm, then there was also sufficient evidence to support the kidnapping element in Count 2.  Therefore, the claim as to Count 2 should also be rejected.

     *3.*    Insufficiency of the Evidence – Attempted Kidnapping of C.M.

     a.    State Court Opinion

In Count 4, Petitioner was convicted of attempted kidnapping of a child to commit a lewd act.  Petitioner claims there was insufficient evidence to support the kidnapping component of Count 4.  This claim was also raised to the Fifth DCA on direct appeal and it too was rejected, as follows:

> Arciga makes a similar argument about the kidnapping component of count 4, attempting to kidnap a child to commit a lewd act. Here, the propriety of the verdict is even more straightforward.
>
> To prove an attempt, the prosecution must show a specific intent to commit the target crime and a direct but ineffectual act done toward its commission. (*People v. Swain* (1996) 12 Cal.4th 593, 604.) A conviction of attempted kidnapping to commit a lewd act therefore requires an intent to commit a lewd act, an intent to cause a "movement of the victim ... beyond that merely incidental to the commission of, and increas[ing] the risk of harm to the victim over and above that necessarily present in" (§ 209, subd. (b)(2)) the lewd act, and a direct, ineffectual act toward commission.
>
> Arciga pointed a weapon at C.M. and ordered her to raise her shirt and get in his truck. From this, the jury could readily infer an intent to drive her away from her school and assault her. Driving her away in the truck certainly would increase the risk to her, even more than did the forcing of M.F. into the truck. The order given at gunpoint was a direct but ineffectual act toward the commission of the crime. The guilty verdict on count 4 was well supported.

Arciga, 2014 WL 1400962, at *8–9.

     b.    Federal Standard and Analysis

The federal standard for insufficiency of evidence claims is set forth in Ground Two above.  With the additional layer of deference required under the AEDPA, the Court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any

1    rational trier of fact could have found the essential elements of the crime beyond a reasonable

2    doubt." <u>Jackson</u>, 443 U.S. at 319.

3          The state court reasonably determined that ample evidence supported each element of the

4    offense.  The court noted that Petitioner demanded the victim undress and get into his truck.

5    From this, the court reasonably found that an inference could be made that Petitioner intended to

6    drive the victim away and sexually assault her.  In addition, Petitioner's order for her to comply at

7    gunpoint constituted the direct but ineffectual act toward commission of the crime.  Finally, it is

8    clear that forcing the victim into the truck and driving her away from the school grounds would

9    greatly increase the risk to her.  Therefore, Petitioner fails to show that no rational trier of fact

10   could have found the essential elements of the crime beyond a reasonable doubt.  The claim

11   should be denied.

12   **IV.    RECOMMENDATION**

13         Accordingly, the Court **RECOMMENDS** that the Petition for Writ of Habeas Corpus

14   (Doc. 1) be **DENIED** with prejudice on the merits.

15         This Findings and Recommendation is submitted to the United States District Court Judge

16   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

17   Local Rules of Practice for the United States District Court, Eastern District of California.  Within

18   twenty-one days after being served with a copy of this Findings and Recommendation, any party

19   may file written objections with the Court and serve a copy on all parties.  Such a document

20   should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies

21   to the Objections shall be served and filed within ten court days (plus three days if served by

22   mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling

23   pursuant to 28 U.S.C. § 636 (b)(1)(C).

24   //

25   ///

26   ///

27   ///

28   ///

The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **December 9, 2016**                          **/s/ Jennifer L. Thurston**
                                                                    UNITED STATES MAGISTRATE JUDGE

20