8          UNITED STATES DISTRICT COURT

9       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  MARIO ARCIGA,                          No. 1:15-cv-01372-DAD-JLT (HC)

12            Petitioner,                  **FINDINGS AND RECOMMENDATION**
                                           **TO DENY PETITION FOR WRIT OF**
13        v.                               **HABEAS CORPUS**

14  SCOTT FRAUENHEIM, Warden,              **[TWENTY-ONE DAY OBJECTION**
                                           **DEADLINE]**
15            Respondent.

16

17          In 2012, Petitioner was sentenced to 25 years-to-life plus 19 years for his convictions on

18  charges of forcible rape, kidnapping to commit rape, attempted lewd act on a child, and attempted

19  kidnapping to commit a lewd act. In this action, Petitioner claims the trial court erred in refusing

20  to sustain his Batson/Wheeler challenge and that there was insufficient evidence to support all of

21  his convictions and the enhancement. The Court disagrees and recommends the petition be

22  **DENIED**.

23  **I.      PROCEDURAL HISTORY**

24          Petitioner was convicted in the Fresno County Superior Court on January 17, 2012, of

25  forcible rape (Cal. Penal Code § 261(a)(2)), kidnapping to commit rape (Cal. Penal Code §

26  209(b)(1)), attempted lewd act on a child (Cal. Penal Code §§ 664/228(a)), and attempted

27  kidnapping to commit a lewd act (Cal. Penal Code §§ 664/209(b)(1)). (Pet. at 1.) He is currently

28  serving an indeterminate sentence of 25 years-to-life plus 19 years. Id.

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"). The Fifth DCA affirmed the judgment on April 11, 2014. (Resp't's Answer, Ex. A.) Petitioner then filed a petition for review in the California Supreme Court. The petition was summarily denied on June 25, 2014. (Pet. at 2.)

## II.    FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[1]:

M.F. walked along a dirt road beside some railroad tracks in Fresno shortly before noon on August 18, 2010, heading for a bus stop. Arciga drove up to her in a pickup truck. He stopped 10 to 15 feet away and lunged out, hitting her on the head as he did so. He wore a black ski mask with holes for his eyes and mouth. She fell to the ground and screamed. He put his hand over her mouth, saying he would hit her again if she continued screaming. He lifted her shirt and bra and put his mouth on her breast. She asked what he wanted. He wanted sex. He raised her from the ground, took her to the truck, and put her inside. Fearing he would hurt or kill her, she did not try to escape. As M.F. sat on the seat, Arciga pulled her shorts and underwear off, unbuttoned his pants, and pulled out his penis. Then he lay on top of her, pinned her arms to her sides with his, and placed his penis inside her vagina. She freed a hand and tried to remove the ski mask, but he prevented her. When he was finished, he put his penis back in his pants and said "thanks." M.F. put her shorts back on, got out of the truck and walked away. As Arciga drove away, M.F. typed the truck's license plate number into her cell phone. She then walked across a field to a strawberry stand and called 911.

Around 8:00 a.m. the next day, August 19, 2010, 12–year–old C.M. was walking to school. As she approached the school, Arciga drove up in a truck and got out, wearing a black ski mask and holding a gun. He approached within four or five feet and told her to get in the truck. She said no, because she was going to be late for school. Arciga told her to take off her shirt. C.M. said no again. She backed up against the schoolyard fence, afraid Arciga would rape or kill her. He kept repeating his order to get in the truck, with the gun pointed at her, but she gave him the same answer. After 5 or 10 minutes, Arciga got back in the truck and left. C.M. went to the school entrance and reported the attack to a security guard.

Based on C.M.'s description of the truck, police pulled Arciga over and arrested him the same morning. Inside the cab of the truck were an air pistol and a black ski mask.

For purposes of DNA testing, samples were taken from M.F., Arciga, and a stain on the seat of a pickup truck. M.F. had identified the truck. DNA from sperm cells found in M.F.'s vagina matched Arciga's DNA profile. The truck seat stain contained DNA matching the profiles of both M.F. and Arciga.

The district attorney filed an information charging Arciga with four counts: (1) forcible rape (Pen.Code, § 261, subd. (a)(2));1 (2) kidnapping to commit rape (§

---

[1] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

209, subd. (b)(1)); (3) attempting to commit a lewd act against a child (§§ 288, subd. (a), 664); and (4) attempting to kidnap a child to commit a lewd act (§§ 209, subd. (b)(1), 664). For count 1, the information alleged the special circumstance that Arciga kidnapped the victim. (§ 667.61, subds. (a), (c)(1), (d)(2).) For counts 3 and 4, the information alleged that Arciga used a deadly weapon. (§ 12022.3, subd. (a).)

At trial, Arciga's defense was that he and M.F. had been dating for two months on August 18, 2010, and that she had consensual sex with him at his house that day. He admitted that he parked his truck near C.M.'s school on August 19, 2010, but denied he confronted C.M. or tried to make her get in the truck. M.F. testified that she had never met Arciga before he raped her.

The jury found Arciga guilty as charged and found the kidnapping and weapon-use allegations true. For count 1, the court imposed a sentence of 25 years to life. For count 4, the court imposed a sentence of 9 years, plus 10 years for the weapon enhancement. Sentences for counts 2 and 3 were imposed and stayed pursuant to section 654. The total unstayed sentence was an indeterminate term of 25 years to life plus a determinate term of 19 years.

People v. Arciga, No. F064382, 2014 WL 1400962, at *1–2 (Cal. Ct. App. Apr. 11, 2014), review denied (June 25, 2014).

## III.    DISCUSSION

### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

### B.    Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

3

the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-13.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637 (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox

4

v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.     Review of Claims

In this action Petitioner claims: 1) He was denied his rights under the Fourteenth Amendment to the Constitution when the trial court found that he had not made a prima facie case of purposeful racial discrimination by the prosecution in its exercise of peremptory challenges; 2) He was denied his rights under the Fourteenth Amendment to the Constitution when a kidnapping enhancement was imposed, and he was convicted of aggravated kidnapping, based on insufficient evidence; and 3) He was denied his due process rights under the Fourteenth Amendment when he was convicted of attempted kidnapping to commit a lewd act based on insufficient evidence.

1.     Batson/Wheeler Challenge

a.     State Court Opinion

Petitioner contends the trial court violated Petitioner's due process rights when it denied defense counsel's Batson/Wheeler[2] motion, finding defense counsel had failed to make a prima facie case of purposeful racial discrimination in its exercise of peremptory challenges. The claim was presented on direct appeal to the Fifth DCA, where it was rejected in a reasoned decision.

The appellate court rejected the claim as follows:

_____

[2] Batson v. Kentucky, 476 U.S. 79 (1986); People v. Wheeler, 22 Cal.3d 258 (1978).

Arciga maintains that the trial court erred when it denied his motion under *Wheeler* and *Batson*. As we will explain, the record supports the trial court's decision.

In 1978, the California Supreme Court held that the California Constitution prohibits the exercise of peremptory challenges on the basis of group bias in a criminal case. (*Wheeler, supra*, 22 Cal.3d at p. 276.) "[T]he use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community...." (*Id.* at pp. 276–277.) In 1986, the United States Supreme Court similarly held that the equal protection clause of the 14th Amendment "forbids the prosecutor to challenge potential jurors solely on account of their race...." (*Batson, supra*, 476 U.S. at p. 89.)

A defendant can raise the *Wheeler/Batson* issue by making a motion in the trial court. To prevail, the defendant must first establish a prima facie case "'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" (*Johnson v. California* (2005) 545 U.S. 162, 168 [quoting *Batson*] (*Johnson*).) It is not necessary at this stage for the defendant to show that the peremptory challenges at issue were more likely than not based on a discriminatory purpose. The defendant's showing need only raise an inference of such a purpose. (*Ibid.*) Next, the burden shifts to the prosecution to produce race-neutral reasons why jurors have been excluded. Finally, on the basis of both sides' submissions, the trial court must decide whether purposeful discrimination has been shown. (*Ibid.*)

In the process of selecting the 12 regular jurors in this case, the court reached the 56th name on the random juror selection sheet. Of this group, four received hardship deferrals. Of the remaining 52, 18 had Spanish surnames. The prosecution exercised 15 peremptory challenges, of which 10 were used to excuse prospective jurors with Spanish surnames. The defense exercised peremptory challenges to excuse four other prospective jurors with Spanish surnames. An additional two were excused for cause. Two remained who were seated on the jury. To summarize, 34.6 percent of the panel from which the jury was selected had Spanish surnames; the prosecution used 66.7 percent of its peremptory challenges to excuse those with Spanish surnames; and 16.7 percent of the jurors that were seated had Spanish surnames.

After jury selection was complete, the court made a record of a *Wheeler/Batson* motion the defense had made during a break. The court denied the motion:

> "We remain on the record. The record should reflect at one of our breaks when I believe when we were going back to challenges for cause, Mr. Criego [defense counsel] raised a *Batson–Wheeler* motion. He made the motion formally. I will now document that motion. I ruled then, and regardless of whatever point it was in the trial, I believe it was after the exercise of [a peremptory challenge excusing prospective juror number 24]—but it may have been later than that—but whatever stage it was, I considered it to be [an] ongoing motion.

> "I'm ruling at this point there has not been a showing of a prima facie case of exclusion. I recognize that of the 15 jurors excused by the defense [sic, prosecution], a significant portion bore Hispanic surnames; however, I did my best to keep track and keep notes. Based upon those jurors' answers, it does appear that none—there was not a pattern of discrimination based upon the racial makeup of the jurors standing alone.

"There has been no showing that the People exercised their peremptory challenges in a racially discriminatory manner. I won't even ask the People to make a response, but I have independently based upon my notes, feel and rule that there has been no showing made."

Arciga contends that a prima facie case was established and that the trial court therefore erred in not requiring the prosecution to proffer nondiscriminatory reasons for its peremptory challenges. He asks us either to reverse and remand for a new trial or to reverse and remand with instructions to the trial court to proceed with the next stage of the *Wheeler/Batson* inquiry and order a new trial if appropriate.

In *Johnson, supra*, 545 U.S. at page 169, the United States Supreme Court reiterated the test for a prima facie case established in *Batson*. That test is as follows:

> "[A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant must first show that he is a member of a cognizable racial group [citation], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' [Citation.] Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." (*Batson, supra*, 476 U.S. at p. 96.)

In this case, it is undisputed that Arciga is a member of a cognizable racial group and that the prosecutor exercised 10 peremptory challenges to excuse potential jurors who belonged to the same group. The only question is whether Arciga showed that, in light of these and the other relevant circumstances, an inference existed that the prosecutor removed those potential jurors on account of their race.

The parties disagree about the standard under which we review a trial court's determination that a defendant has failed to support a *Wheeler/Batson* motion by making a prima facie case of discrimination. Arciga maintains that we are to review this question de novo. The People contend that we should review the record only for substantial evidence supporting the trial court's decision. Both sides cite case law in support of their view. (*People v. Streeter* (2012) 54 Cal.4th 205, 222 [reviewing record independently "to resolve the legal question whether the record supports an inference that the prosecutor excused a juror on the basis of race"] (*Streeter*); *People v. Lenix* (2008) 44 Cal.4th 602, 613 ["Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions."].) Our Supreme Court has, however, recently reaffirmed the following specific description of the review we are to undertake in a case like this one:

> "'"When a trial court denies a *Wheeler* motion without finding a prima facie case of group bias, the appellate court reviews the record of voir dire for evidence to support the trial court's ruling. [Citations.] We will affirm the ruling where the record suggests grounds upon which the prosecutor might reasonably have challenged the jurors in question." [Citation]' [Citation.]" (*People v. Pearson* (2013) 56 Cal.4th 393, 421 (*Pearson*.)

7

In *Pearson*, a capital case, the court examined the voir dire transcript for the excused prospective juror at issue. It recited several facts about her—that she would find it hard to vote for the death penalty because of her religious beliefs, that she was acquainted with the prosecutor and a defense witness, and other facts—each of which "would provide an adequate reason other than racial discrimination to support the prosecutor's challenge." This analysis demonstrated that the trial court did not err in finding that the defendant failed to present a prima facie case. (*Pearson, supra*, 56 Cal.4th at p. 422.)

We turn, therefore, to the voir dire transcript to seek evidence of grounds upon which the prospective jurors might reasonably have been challenged. The 10 Spanish-surnamed prospective jurors excused by the prosecution were numbers 1, 8, 15, 25, 28, 32, 41, 46, 48, and 56. As will be seen, we hold that there were adequate reasons other than racial discrimination for each challenge.

Prospective Juror No. 1 testified that she had been arrested on a misdemeanor child endangerment charge. She felt the authorities treated her well on that occasion. She was unmarried, unemployed, and a high-school dropout. She spent her spare time with her son and looking for work. The prosecution could reasonably have challenged prospective Juror No. 1 on the basis of these facts. A person with a record of arrest for endangering a child might have a less-protective attitude toward children, such as the child victim in this case, than some other people. A person with a low education level might be regarded as less likely to understand and correctly apply the law.

Prospective Juror No. 8 was a college student, unmarried, and childless. He testified about an encounter he and his father had with two deputy sheriffs after an accident involving a golf cart. One deputy was "really nice," but the other was "just a jerk" and called the father a jackass. Prospective Juror No. 8 said he would be able to put this experience aside and be impartial, yet the experience was "still like in the back of my mind." The prosecutor could reasonably conclude that this juror was more likely than others to mistrust police testimony. The prosecutor also could reasonably factor in the juror's childlessness as possibly making him less sympathetic to the child victim than a parent might be.

Prospective Juror No. 15 was engaged in postgraduate study and was employed in a school district's migrant education program. The prosecutor asked her, "[I]f you saw a rape victim testify and they did not cry on the stand, they did not fall apart on the stand, are you automatically going to say, well, I can't believe anything she says?" The transcript indicates that prospective Juror No. 15's response was a nod. The prosecutor then said, "No? Okay. So how a rape victim reacts is very different." Because the juror's response was ambiguous and the prosecutor's follow up did not yield any clarification, the prosecutor could reasonably be concerned that the juror would be more likely than others to disbelieve an unemotional victim witness. If the juror failed to understand the question, the prosecutor might reasonably have been concerned about the juror's possible lack of attentiveness.

Prospective Juror No. 25 was an accountant. The prosecutor explained that she had a brother who was an accountant, and she had a "concern" that the juror's profession might mean he had a "personality thing" that would demand absolute certainty and prevent him from properly applying the reasonable doubt standard. The juror replied that he did not use the standards applicable to his work in everyday life and would be able to follow the court's instructions. Prospective Juror No. 25 also testified that his father was once arrested for possession of narcotics for sale. The juror believed his father was treated fairly by the

prosecution and the court and adequately represented by defense counsel. The father's case was dismissed. In our view, the prosecutor could reasonably believe, despite the juror's assurance that he did not feel there was any unfairness in his father's case, that the juror might harbor resentment against law enforcement. The prosecutor also could reasonably feel, again in spite of the juror's assurances, that the juror's profession might make him more likely than others to demand greater certainty than the law requires for conviction.

Prospective Juror No. 28 had passed the GED exam and received a high school equivalency credential. He worked at a coffee house and was unmarried and childless. The prosecutor could reasonably take account of his lower education level, particularly in light of the fact that the trial would include scientific testimony regarding DNA evidence. The prosecutor also could take account of the juror's unmarried and childless state, as this could be an indication that the juror might lack understanding of a female witness's potential lack of emotion while testifying.

Prospective Juror No. 32 was a registered nurse employed at a hospital. She raised her hand and told the court, "I don't think I can judge appropriately just because of my personality and I have a hard time judging if I judge correctly or not." Later, when defense counsel asked if anyone believed he or she should not be a juror, prospective Juror No. 32 again raised her hand and said, "Again, real opinion on this case, I just don't feel like I would want to be responsible for judging." Upon further questioning by defense counsel, the juror said she could "be open minded on both sides" but still maintained that "that's going to be difficult for me because I just—my personality—because my personality...." Defense counsel interrupted and asked further questions, after which the juror finally said she would be fair and did not believe she should be excused. The juror had a brother who had been arrested and spent a few days in jail for driving under the influence. She felt he was treated fairly. The prosecutor could reasonably conclude that this juror had no confidence in her ability to reach a verdict in this case and only said otherwise in the end because of defense counsel's insistent questioning. The prosecutor also could reasonably take account of the juror's experience of a family member being arrested and incarcerated.

Prospective Juror No. 41 had a felony charge pending in Madera County. He felt he was being treated fairly. The prosecutor could reasonably believe the juror's perception of law enforcement and the criminal process could be colored, to the prosecution's detriment, by the juror's own experience of being prosecuted. She also could reasonably believe the juror would be preoccupied during the trial by the question of his own future.

Prospective Juror No. 46 was a special education teacher and was working on a master's degree in special education. She was engaged to be married and was childless. She requested a hardship deferral because her graduate school classes were set to begin on what the court had said would probably, but not necessarily, be the last day of trial. The court denied her request, saying it would excuse her and use an alternate at that time if necessary. The prosecutor could reasonably conclude that this juror might be preoccupied by the possibility that the trial would end up conflicting with the start of classes and might be distracted by the thought that if she were excused at the end of the trial, several days of her time would have been wasted. The prosecutor also could, again, factor in the juror's childlessness.

Prospective Juror No. 48 was married and had children, was unemployed, and "[j]ust barely went to high school." His car was burglarized twice in six months

and he was frustrated that the police declined to come investigate. When asked whether, as a result, he would be critical of law enforcement in this case, he said, "I don't think so." The prosecutor could reasonably believe that this juror was more likely than others to be influenced by resentment toward police officers. The prosecutor could, once again, also consider the juror's limited education.

Prospective Juror No. 56 testified that he was not arrested but "detained" in Los Angeles five months earlier. While at an establishment on Sunset Boulevard, he stepped outside for "some fresh air." Some police officers took and searched his wallet and made him get in the back of a police car before releasing him. He said the incident "[l]eft me kind of upset." When asked whether it would affect his ability to be fair and impartial, he said, "I hope not." The prosecutor could reasonably conclude that this juror would be more likely than others to resent and mistrust police officers and therefore would be less likely to believe police testimony.

In light of the foregoing, we hold that the record of voir dire contains grounds upon which the prosecutor could reasonably challenge these 10 prospective jurors.

Arciga cites federal appellate decisions stating that "comparative juror analysis" is appropriate in determining whether a prima facie case was made. (*E.g., Boyd v. Newland* (9th Cir.2006) 467 F.3d 1139, 1148.) Comparative juror analysis means a comparison of the jurors challenged with those of another race who were not challenged, with the goal of determining whether the prosecutor could really have been concerned with the issues that might have supported the challenges. As Arciga acknowledges, however, our Supreme Court has repeatedly held that comparative juror analysis is not an appropriate part of our review of the prima-facie-case issue. (*Streeter, supra*, 54 Cal.4th at p. 226, fn. 5; *People v. Taylor* (2010) 48 Cal.4th 574, 616–617; *People v. Hawthorne* (2009) 46 Cal.4th 67, 80, fn. 3, *overruled on other grounds by People v. McKinnon* (2011) 52 Cal.4th 610, 637–638.) Consequently, we will not discuss that issue further.

Next, Arciga argues that the trial court erred when it referred to the absence of a "pattern" of racial discrimination in the prosecutor's use of peremptory challenges. This argument is based in part on a misunderstanding of the authority Arciga cites. In one passage in *Johnson, supra*, 545 U.S. at page 169, footnote 5, cited by Arciga, the United States Supreme Court reiterated the holding of *Batson* that a prima facie case can be established on the basis of the facts in the defendant's own case, as opposed to a pattern of prosecutorial action across multiple cases. The trial court here plainly was not referring to that kind of pattern.

It is true, however, that a single instance of a peremptory challenge motivated by a discriminatory intent is unconstitutional; there need not be a pattern consisting of more than one such challenge within a defendant's own case. (*Snyder v. Louisiana* (2008) 552 U.S. 472, 478.) Yet we do not think the experienced trial judge who presided in this case believed a small number of racially discriminatory challenges, or a single racially discriminatory challenge, would have been acceptable. The court stated that it had kept track of the individual jurors' answers and in light of those answers found no prima facie case of discrimination. This indicates that the court was monitoring the voir dire of each prospective juror for signs of improper challenges. We conclude that the court did not apply an erroneous standard, despite its use of the word "pattern."

Finally, Arciga asserts that the percentages alone—the prosecutor used 66.7 percent of her peremptories against a group comprising only 34.6 percent of the

panel from which the jury was selected—established a prima facie case. There is, however, no rule that a prima facie case is established whenever a given threshold of disparity is crossed. Instead, the rule is that, even if a statistical disparity exists, a ruling of no prima facie case should be affirmed if the "record suggests that the prosecutor had ... race neutral reasons" for excusing the jurors. (*Pearson, supra*, 56 Cal.4th at p. 422.) In *Pearson*, the reasons in the record supporting the challenge at issue were sufficient to support the trial court's finding of no prima facie case even though the prosecutor used 50 percent of his peremptory challenges against African–American prospective jurors, where only 12.5 percent of the prospective jurors were African–American. (*Ibid*.) This case is comparable. (*See also Streeter*, *supra*, 54 Cal.4th at p. 223 [no prima facie case even though prosecutor used 60 percent of peremptories to excuse African–American prospective jurors who comprised only 28 percent of those called to jury box during voir dire].)

For all these reasons, we conclude that the trial court did not err when it found that Arciga failed to establish a prima facie case in support of his *Wheeler/Batson* motion.

*Arciga*, 2014 WL 1400962, at *2–7.

   **b.**  Federal Standard

   Racial discrimination by the state in jury selection offends the Equal Protection Clause. Miller–El v. Dretke, 545 U.S. 231, 238 (2005). A criminal defendant is denied equal protection of the law if he is indicted by a grand jury or tried by a petit jury from which members of his race have been excluded because of their race. Eubanks v. Louisiana, 356 U.S. 584, 585 (1958). Purposeful discrimination on the basis of race or gender in the exercise of peremptory challenges violates the Equal Protection Clause of the United States Constitution. See Batson v. Kentucky, 476 U.S. 79, 85 (1986); Johnson v. California, 545 U.S. 162 (2005). A defendant, however, has no right to a "petit jury composed in whole or in part of persons of his own race." Batson, 476 U.S. at 85 (quoting Strauder v. West Virginia, 100 U.S. 303, 305 (1879)). Rather, a defendant has the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria. Id. at 85–86 (citing Martin v. Texas, 200 U.S. 316, 321 (1906)).

   A Batson challenge involves a three-step analysis:

First, the movant must make a prima facie showing that the prosecution has engaged in racially discriminatory use of a peremptory challenge. Second, once the trial court decides a prima facie case has been established, the burden shifts to the prosecutor to articulate a race-neutral explanation for the challenges. Third, the trial court must determine whether the defendant has established purposeful discrimination. If the defendant fails to establish a prima facie case, the burden does not shift to the prosecution, and the prosecutor is not required to offer an explanation for the challenge.

11

Tolbert v. Gomez, 190 F.3d 985, 987-88 (9th Cir.1999) (internal citations omitted).

The Supreme Court has stated that in order to establish a prima facie case of discrimination,

> the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

Batson, 476 U.S. at 96 (internal citations omitted). In making its determination, the trial court must consider the totality of relevant circumstances. Id. at 94, 96. A prima facie case of discrimination "can be made out by offering a wide variety of evidence, so long as the proffered facts give 'rise to an inference of discriminatory purpose.'" Johnson v. California, 545 U.S. 162, 169 (2005) (quoting Batson, 476 U.S. at 94.) To establish such an inference, a "pattern of strikes" might give rise to an inference of discrimination. Batson, 476 U.S. at 97. Nevertheless, proof of a pattern or practice is not required because "[a] single invidiously discriminatory governmental act" is sufficient. Johnson, 545 U.S. at 171; see also United States v. Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir.1994). Nevertheless, the striking of one juror of a cognizable racial group does not by itself raise an inference of discriminatory purpose. Vasquez-Lopez, 22 F.3d at 902. In addition, "the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." Batson, 476 U.S. at 97.

Further, the Court is mindful that "[t]he trial judge, experienced in supervising voir dire, is in the unique position of observing the voir dire firsthand, as well as the prosecutor's questions and statements during examination, an activity that may support or refute an inference of discriminatory motive." Tolbert, 190 F.3d at 988 (citing Batson, 476 U.S. at 97).

c.      Analysis

In this case, the defendant is Hispanic and the prosecution removed ten prospective jurors with Spanish surnames. Thus, Petitioner established the first two requirements of a prima facie

12

case for discrimination. However, the trial court found that there were no circumstances raising an inference that the challenges were motivated by race. Petitioner claims the trial judge used an incorrect standard by looking for a "pattern" of discrimination. However, the appellate court reasonably determined that the trial judge, despite his use of the word "pattern," considered the totality of the circumstances. The record supports the state court determination. The trial judge noted that he relied upon his notes and independently considered each juror. The trial judge also stated that he considered the defense Batson challenge as ongoing, which shows the judge looked at each voir dire for discriminatory motive. Thus, Petitioner fails to rebut the presumption that the state court finding was correct. 28 U.S.C. § 2254(e)(1).

In addition, the appellate court looked to the entire voir dire transcript and determined that the record supported race-neutral reasons for each of the prosecution's challenges. The court noted that Prospective Juror 1 had a record of child endangerment and therefore might have a less-protective attitude toward a child than others. Prospective Juror 8 testified that an officer had been a "jerk" to him in a previous encounter with law enforcement, and the experience was "still like in the back of my mind." The court concluded that the prosecutor could reasonably have believed the juror would be more likely to distrust police testimony. Prospective Juror 15 responded ambiguously when asked about how she perceived an unemotional rape victim. The court found the prosecutor could have been concerned with the juror's perception of a rape victim witness, or the juror's possible lack of attentiveness. The court found that the prosecutor could have believed Prospective Juror 25 might have harbored resentment against law enforcement, or that the juror's profession might have made it more likely to demand greater certainty than the law required for conviction. Prospective Juror 28 was less educated, unmarried and childless. The court found that the prosecutor could have concluded that the juror did not possess sufficient education, or that the juror's childless and unmarried state could indicate a lack of understanding for a female witness's lack of emotion while testifying. Prospective Juror 32 testified that she had trouble making decisions and did not want to be responsible for judging. The court determined that this was sufficient reason in itself for challenge. Prospective Juror 41 had a pending felony charge in another county. The court concluded that the prosecutor could have been concerned that

the juror's view of law enforcement and the criminal process could be colored to the prosecution's detriment, or that the juror would be preoccupied with his ongoing case. Prospective Juror 46 requested a hardship deferral because her graduate school classes were set to begin on the possible last day of trial. The trial court denied her request. The appellate court found that the prosecutor may have been concerned that the juror would be preoccupied by the possibility the trial would end up conflicting with her classes. Prospective Juror 48 had expressed frustration with law enforcement's response to his reports of burglaries. When the juror was asked whether he would be critical of law enforcement, he stated, "I don't think so." The court concluded that the prosecutor could have been concerned that the juror would be biased against law enforcement. Finally, Prospective Juror 56 described a recent involvement with law enforcement that "left [him] kind of upset." The court concluded that the prosecutor could have been concerned that this juror would also be biased against law enforcement.

Based on its review, the state court found race-neutral reasons for each challenge. Petitioner has not shown the court's determination of these facts to be unreasonable. Thus, a fair-minded jurist could conclude that the trial judge did not err when it did not find an inference of purposeful racial discrimination.

Petitioner argues that the statistics alone provide an inference of purposeful discrimination; however, the Court is not aware of any Supreme Court authority which holds that statistics alone can provide a prima facie case. Even if that were the case, fair-minded jurists could differ on whether the statistics here would be sufficient.

Petitioner further argues that the trial court's determination should be rejected because the state court failed to conduct a comparative juror analysis. However, no Supreme Court case holds that a comparative juror analysis is required at the first stage of the Batson inquiry. In Miller-El v. Dretke, 545 U.S. 231 (2005), the Supreme Court employed comparative juror analysis, but it did so at the third stage of the Batson inquiry. The Court utilized comparative juror analysis to test the prosecutor's justifications for his challenges. Id. The Court stated: "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be

considered *at Batson's third step*." Id. at 241 (emphasis added).  In this case, the trial court did not find a prima facie case and specifically declined to ask the prosecutor for his justifications, thus ending the Batson inquiry at the first step.  Petitioner cites to the case of Boyd v. Newland, 467 F.3d 1139 (9th Cir. 2006), wherein the Ninth Circuit found that comparative juror analysis is required at all steps of the Batson inquiry.[3]  However, the Supreme Court has held that "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'"  Glebe v. Frost, __ U.S. __, 135 S. Ct. 429, 431, 190 L. Ed. 2d 317 (2014).  The Court is unaware of any Supreme Court authority employing or suggesting the use of comparative juror analysis prior to Batson's third step.  Since the Court has not "squarely" established such a rule, Petitioner cannot establish that the trial court's alleged error was contrary to or an unreasonable application of Supreme Court authority.  Harrington, 562 U.S. at 101.

Even if the Court were to consider Petitioner's comparative juror arguments at the first stage in evaluating the trial court's prima facie case determination, the claim fails.  The record plainly reveals valid race-neutral reasons for challenging the specific jurors Petitioner has identified.  For each challenged juror, there exist non-pretextual reasons that distinguish him or her from the seated jurors Petitioner compares.

Petitioner claims that the prosecutor's challenges to Prospective Jurors 15 and 46 were pretextual since Jurors 17 and 49 were similarly situated yet went unchallenged.  He notes that all four jurors were teachers or worked in education and had no children.  In addition, Juror 17, like Prospective Jurors 15 and 46, was unmarried.  However, the record reveals that Prospective Jurors 15 and 46 were not challenged because of their profession, marital status, or lack of children.  As noted by the Fifth DCA, the prosecutor asked Prospective Juror 15 if she "saw a rape victim testify and they did not cry on the stand, they did not fall apart on the stand, are you automatically going to say, well, I can't believe anything she says?"  (LD 14 at 23.)  Prospective Juror 15 nodded in response.  (LD 14 at 23.)  The prosecutor replied, "No? Okay. So how a rape

---

[3] Subsequently, Ninth Circuit cases have applied comparative juror analysis at the third stage of the Batson inquiry. See, e.g., McDaniels v. Kirkland, 813 F.3d 770, 778–79 (9th Cir. 2015); Murray v. Schriro, 745 F.3d 984, 1003–04 (9th Cir. 2014); Jamerson v. Runnels, 713 F.3d 1218, 1224 (9th Cir. 2013); Briggs v. Grounds, 682 F.3d 1165, 1170 (9th Cir.2012); Green v. LaMarque, 532 F.3d 1028, 1029–31 (9th Cir. 2008).

victim reacts is very different." (LD 14 at 23.)  Prospective Juror 15 offered no further clarification.  Therefore, the prosecutor could have been concerned that Prospective Juror 15 would disbelieve an unemotional victim witness.  Or, given the lack of response, the prosecutor could have been concerned over the juror's lack of attentiveness.  Prospective Juror 46 was employed as a teacher and also in school seeking an advanced degree.  (LD 13 at 111.)  In addition, she was preparing for her upcoming wedding and "doing paperwork" in her spare time.  (LD 13 at 111.)  She had asked for a hardship deferral.  (LD 13 at 5.)  In light of her current situation, the prosecutor could reasonably have been concerned that Prospective Juror 46 would have a difficult time focusing on the case.

Petitioner further claims the prosecutor discriminated when she challenged Prospective Jurors 32 and 25 but did not challenge Jurors 37, 40, and 33, who were similarly situated.  He alleges all of the jurors had family members who were charged with crimes.  However, there were reasons other than those relationships for challenging Prospective Jurors 32 and 25.  On numerous occasions, Prospective Juror 32 expressed that she would have difficulties judging another person.  (LD 14 at 45.)  She doubted she would be able to judge appropriately because of her personality.  (LD 14 at 45.)  When asked if anyone should not be on the jury, she responded affirmatively and stated she didn't want to be responsible for judging another.  (LD 14 at 79-80.)  Prospective Juror 25 was an accountant.  The prosecutor, based her experiences with her brother who was also an accountant, expressed her concern that he would be so exacting because of his profession that he would require proof beyond all *possible* doubt rather than *reasonable* doubt.  (LD 14 at 85-86.)  Thus, Prospective Jurors 32 and 25 were not comparable to Jurors 37, 40, and 33.

Petitioner also points to the prosecutor's challenge to Prospective Juror 28, but he fails to compare this juror to any other juror.  Moreover, the state court reasonably determined that Prospective Juror 28's low education level and background could have caused the prosecutor concern given the scientific testimony that would be involved.  In addition, the prosecutor could have been concerned that the juror might lack understanding of a female witness's emotional state while testifying given the fact he was unmarried and childless.

Finally, Petitioner alleges that Prospective Juror 56 was comparable to Juror 40 since both jurors had experiences with law enforcement. Yet, the two jurors' experiences were vastly different. Juror 40 had been charged with a crime 20 years prior to the proceeding, and he stated he was treated appropriately by all parties and held no contempt for law enforcement. (LD 14 at 102-104.) Prospective Juror 56 on the other hand had a negative experience with law enforcement five months prior to the proceeding. (LD 13 at 109-110.) He stated he had been falsely detained, his rights had been violated, and he had planned to pursue a complaint as a result. (LD 13 at 109-110.) When asked if that experience would affect his judgment, he stated, "I hope not." (LD 13 at 110.) The prosecutor could reasonably have been concerned that Prospective Juror 56 would hold his negative experience against law enforcement and the prosecution.

In sum, a fair-minded jurist could agree with the state court that Petitioner failed to establish a prima facie case of intentional discrimination. Petitioner fails to demonstrate that even if the court were to consider Petitioner's comparative analysis, a prima facie case of intentional discrimination would be established.

2.     <u>Insufficiency of the Evidence – Kidnapping of M.F.</u>

a.     <u>State Court Opinion</u>

Petitioner alleges there was insufficient evidence to support the second count of aggravated kidnapping and the special circumstance of kidnapping attached to the rape offense. This claim was also presented on direct appeal to the Fifth DCA, where it was rejected as follows:

> Arciga maintains that there was insufficient evidence to support the conviction on count 2, kidnapping to commit rape, or the true finding on the kidnapping special circumstance charged in connection with count 1, rape. He says the evidence did not show he kidnapped M.F., since it was undisputed that he only moved her 10 to 15 feet from the dirt road to the cab of the truck. We conclude that this movement was sufficient to support the jury's findings.
>
> > "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] When reviewing the sufficiency of evidence to support a special circumstance, the relevant inquiry is '"whether, after viewing the evidence in the light most favorable

to the People, any rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt.'" [Citations.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

Proof of the kidnapping circumstance requires a showing that the defendant kidnapped the victim and "the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense...." (§ 667.61, subd. (d)(2).) The elements of the kidnapping portion of the offense of kidnapping to commit rape are similar: "[T]he movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (§ 209, subd. (b)(2).) This provision requires lesser proof than section 667.1, subdivision (d)(2), because it does not call for a substantial increase in the risk of harm. Consequently, if the movement did substantially increase the risk of harm to M.F. over the risk inherent in rape and was not merely incidental to the rape, then both the kidnapping circumstance in count 1 and the kidnapping element of the offense in count 2 were established.

Our Supreme Court has held that factors relevant to a substantial increase in the risk of harm include decreased likelihood of detection, danger inherent in a victim's foreseeable efforts to escape, and the defendant's enhanced opportunity to commit additional crimes. (*People v. Vines* (2011) 51 Cal.4th 830, 870.)

The jury could reasonably find that moving M.F. from the road to the truck was not merely incidental to the rape and substantially increased the risk of harm to her. By placing M.F. on her back on the truck's seat and then obstructing the doorway with his body, Arciga reduced the likelihood that the attack would be seen and stopped by passersby, increased the difficulty and danger involved in any possible escape attempt by M.F., and placed M.F. more completely within his control. Arciga greatly enhanced the potential for removing M.F. from the scene and inflicting further harm on her by forcing her into a vehicle. There is no question that a rape victim who has been forced into a vehicle faces an increased threat to her life and safety beyond that faced by a victim raped outside on the ground.

This conclusion is supported by *People v. Diaz* (2000) 78 Cal.App.4th 243, 248–249. Diaz accosted his victim on a sidewalk in Los Angeles. He forced her to the ground on a grassy area beside the sidewalk and got on top of her. A passerby in a car saw this and said something. Diaz then forced the victim into a park and behind a closed building, where he sexually assaulted her. This was at least 150 feet from the place where he found her. The Court of Appeal held that the jury properly found the movement of the victim into the park and behind the building was not incidental to the assault and substantially increased the risk to the victim. The initial move from the sidewalk to the grass beside it "could easily be characterized as incidental, in that it effected no substantial change in the surroundings...." (*Id*. at p. 249.) The movement into the park and behind the building, by contrast, "dramatically changed the environmental context." (*Id*. at p. 248.) Further, "the risk to the victim in the dark and isolated location of the attack increased significantly as compared to the lighted sidewalk near the bus stop

where the incident began." (*Id*. at p. 249.) Here, similarly, an attack beside the road might not have supported the kidnapping aspects of the verdict, but the movement into the truck was a significant, nonincidental change in surroundings that made the situation substantially more dangerous for M.F.

Arciga, 2014 WL 1400962, at *7–8.

      b.    Federal Standard

The law on sufficiency of the evidence is clearly established by the United States Supreme Court. Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is as follows: "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990). Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

In Cavazos v. Smith, 565 U.S. 1, 2 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson,

makes clear that it is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no

19

rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

        c.    <u>Analysis</u>

Petitioner contends that the movement of victim M.F. from the road and into the truck was insufficient to support the substantive offense of kidnapping with intent to rape or the special circumstance of kidnapping. He argues that the distance of ten to fifteen feet was negligible and the difference in location did not increase the risk of harm to the victim. As noted above, the appellate court rejected Petitioner's claim and found sufficient evidence supported the kidnapping special circumstance. This Court agrees.

While the distance Petitioner moved the victim was short, there is no question that the movement of the victim into the truck increased the risk of harm to the victim. The victim was placed on her back on the truck's seat, and Petitioner stood at the doorway thereby placing Petitioner in complete control of the victim and preventing any possible escape. By taking this position, Petitioner reduced the likelihood that any passerby would be alerted to the rape. In addition, the victim faced even more danger with the possibility of being driven away in the vehicle and having further harm inflicted upon her. In light of these facts, the state court reasonably found that there was more than sufficient evidence supporting the finding that the victim was moved in such a way as to "substantially increase[] the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense." Cal. Penal Code § 667.61(d)(2). The state court's finding was not contrary to, or an unreasonable application of, controlling Supreme Court authority. The claim should be rejected.

In addition, the substantive offense of aggravated kidnapping in Count 2 requires an even lesser showing with respect to the element of kidnapping, since aggravated kidnapping does not require a "substantial increase" in the risk of harm. Since the evidence supports a substantial increase in the risk of harm, then there was also sufficient evidence to support the kidnapping

element in Count 2. Therefore, the claim as to Count 2 should also be rejected.

      3.     Insufficiency of the Evidence – Attempted Kidnapping of C.M.

          a.     State Court Opinion

In Count 4, Petitioner was convicted of attempted kidnapping of a child to commit a lewd act. Petitioner claims there was insufficient evidence to support the kidnapping component of Count 4. This claim was also raised to the Fifth DCA on direct appeal and it too was rejected, as follows:

> Arciga makes a similar argument about the kidnapping component of count 4, attempting to kidnap a child to commit a lewd act. Here, the propriety of the verdict is even more straightforward.
>
> To prove an attempt, the prosecution must show a specific intent to commit the target crime and a direct but ineffectual act done toward its commission. (*People v. Swain* (1996) 12 Cal.4th 593, 604.) A conviction of attempted kidnapping to commit a lewd act therefore requires an intent to commit a lewd act, an intent to cause a "movement of the victim ... beyond that merely incidental to the commission of, and increas[ing] the risk of harm to the victim over and above that necessarily present in" (§ 209, subd. (b)(2)) the lewd act, and a direct, ineffectual act toward commission.
>
> Arciga pointed a weapon at C.M. and ordered her to raise her shirt and get in his truck. From this, the jury could readily infer an intent to drive her away from her school and assault her. Driving her away in the truck certainly would increase the risk to her, even more than did the forcing of M.F. into the truck. The order given at gunpoint was a direct but ineffectual act toward the commission of the crime. The guilty verdict on count 4 was well supported.

*Arciga*, 2014 WL 1400962, at *8–9.

          b.     Federal Standard and Analysis

The federal standard for insufficiency of evidence claims is set forth in Ground Two above. With the additional layer of deference required under the AEDPA, the Court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

The state court reasonably determined that ample evidence supported each element of the offense. The court noted that Petitioner demanded the victim undress and get into his truck. From this, the court reasonably found that an inference could be made that Petitioner intended to drive the victim away and sexually assault her. In addition, Petitioner's order for her to comply at

gunpoint constituted the direct but ineffectual act toward commission of the crime. Finally, it is clear that forcing the victim into the truck and driving her away from the school grounds would greatly increase the risk to her. Therefore, Petitioner fails to show that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The claim should be denied.

## IV.     RECOMMENDATION

Accordingly, the Court **RECOMMENDS** that the Petition for Writ of Habeas Corpus (Doc. 1) be **DENIED** with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten court days (plus three days if served by mail) after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   **June 23, 2017**                            **/s/ Jennifer L. Thurston**
                                                    UNITED STATES MAGISTRATE JUDGE