1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MARIO ARCIGA,                            No.  1:15-cv-01372-DAD-BAK (EPG)

12                  Petitioner,

13        v.                                  ORDER DECLINING TO ADOPT FINDINGS
                                             AND RECOMMENDATIONS IN PART;
14   SCOTT FRAUENHEIM,                        SETTING AN EVIDENTIARY HEARING ON
                                             PETITIONER'S *BATSON* CLAIM; AND
15                  Respondent.               REFERRING PETITION TO THE FEDERAL
                                             DEFENDER'S OFFICE
16
                                             (Doc. No. 30)
17

18

19                                  **BACKGROUND**

20        Petitioner Mario Arciga is a state prisoner proceeding *pro se* and *in propria persona* with

21   a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The matter was referred to a

22   United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.

23        In his pending petition, petitioner asserts that he was denied his rights under the

24   Fourteenth Amendment to the U.S. Constitution when he was tried and convicted of forcible rape,

25   kidnapping to commit rape, attempted lewd act on a child, and attempted kidnapping to commit a

26   lewd act, in the Fresno County Superior Court in 2012, for which he is currently serving an

27   indeterminate sentence of 25 years-to-life plus 19 years in state prison.  (Doc. No. 1 at 1.)

28   Petitioner asserts three claims for federal habeas relief in the petition pending before this federal

                                            1

1    court.  First, petitioner seeks federal habeas relief on the ground that the state trial court violated

2    his due process rights when it denied his *Batson*/*Wheeler*[1] motion by finding that he had failed to

3    make a *prima facie* showing of racial discrimination in the prosecutor's exercise of peremptory

4    challenges—using 10 of 15 strikes (66.6%) on prospective jurors with Spanish surnames.  (*Id.* at

5    28.)  Second, petitioner claims that the state trial court imposed a kidnapping enhancement and

6    that he was convicted of kidnapping to commit rape based on insufficient evidence.  (*Id.* at 40.)

7    Third, petitioner claims that he was convicted of attempted kidnapping to commit a lewd act

8    based on insufficient evidence.  (*Id.* at 50.)

9         On June 26, 2017, the then-assigned magistrate judge issued findings and

10   recommendations recommending that petitioner's petition for federal habeas relief be denied on

11   the merits as to all three of his claims.  (Doc. No. 30.)  Those pending findings and

12   recommendations were served on all parties and contained notice that any objections thereto were

13   to be filed within twenty-one (21) days from the date of service.  (*Id.* at 22.)  On July 19, 2017,

14   petitioner timely filed objections to the pending findings and recommendations.  (Doc. No. 31.)

15   Respondent did not file any such objections or a response to petitioner's objections, and the time

16   in which to do so has passed.

17        In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C), the court has conducted a

18   *de novo* review of this case.  Having carefully reviewed the entire file, including petitioner's

19   objections, the undersigned will adopt the pending findings and recommendations, in part.

20   Specifically, the findings and recommendations concerning petitioner's claims of insufficient

21   evidence to support his conviction will be adopted.  For the reasons explained below, however,

22   the undersigned declines to adopt the recommendation concerning petitioner's *Batson* claim.

23   /////

---

[1]  *Batson v. Kentucky*, 476 U.S. 79 (1986); *People v. Wheeler*, 22 Cal. 3d 258 (1978).  *Wheeler* is considered the California procedural equivalent of *Batson*.  *See Crittenden v. Ayers*, 624 F.3d 943, 951 (9th Cir. 2010).  In petitioner Arciga's underlying criminal case, the state courts referred to his motion as a *Batson/Wheeler* or *Wheeler/Batson* motion.  *People v. Arciga*, No. F064382, 2014 WL 1400962, at *2 (Cal. Ct. App. Apr. 11, 2014).  For simplicity's sake, in this order the court refers to petitioner's motion as a *Batson* motion and his claim in that regard as a *Batson* claim.

1  **LEGAL STANDARD**

2    "[A] district court shall entertain an application for a writ of habeas corpus in behalf of a

3  person in custody pursuant to the judgment of a state court only on the ground that he is in

4  custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C.

5  § 2254(a).  Pursuant to 28 U.S.C. § 2254(d)(1), as amended by the Antiterrorism and Effective

6  Death Penalty Act of 1996 ("AEDPA"), an application for a writ of habeas corpus shall not be

7  granted "with respect to any claim that was adjudicated on the merits in State court proceedings"

8  unless the state court's adjudication of that claim "resulted in a decision that was contrary to, or

9  involved an unreasonable application of, clearly established Federal law, as determined by the

10  Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

11    Clearly established federal law consists of holdings of the United States Supreme Court at

12  the time of the last reasoned state court decision.  *Greene v. Fisher*, 565 U.S. 34, 38 (2011).

13  "[C]ircuit court precedent may be persuasive in determining what law is clearly established and

14  whether a state court applied that law unreasonably."  *Stanley v. Cullen*, 633 F.3d 852, 859 (9th

15  Cir. 2011) (citation omitted).  However, circuit precedent may not be "used to refine or sharpen a

16  general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme]

17  Court has not announced."  *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (citing *Parker v.*

18  *Matthews*, 567 U.S. 37, 49 (2012)).  Nor may circuit precedent be used to "determine whether a

19  particular rule of law is so widely accepted among the Federal Circuits that it would, if presented

20  to th[e] [Supreme] Court, be accepted as correct."  *Id.*

21    A state court decision is "contrary to" clearly established federal law "if it 'applies a rule

22  that contradicts the governing law set forth in [Supreme Court] cases' or if it 'confronts a set of

23  facts that are materially indistinguishable from a decision of [the Supreme] Court and

24  nevertheless arrives at a result different from [Supreme Court] precedent.'"  *Price v. Vincent*, 538

25  U.S. 634, 640 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)).

26    As to whether a state court's decision involved an "unreasonable application of" clearly

27  established federal law, "a federal habeas court may not issue the writ simply because that court

28  concludes in its independent judgment that the relevant state-court decision applied clearly

1   established federal law erroneously or incorrectly.  Rather, that application must also be

2   unreasonable." *Williams*, 529 U.S. at 411.  An "unreasonable application of" clearly established

3   federal law "must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not

4   suffice." *White v. Woodall*, 572 U.S. 415, 419–20 (2014) (quoting *Lockyer v. Andrade,* 538 U.S.

5   63, 75–76 (2003)) (internal quotation marks omitted).  Rather, to obtain federal habeas relief, "a

6   state prisoner must show that the state court's ruling on the claim being presented in federal court

7   was so lacking in justification that there was an error well understood and comprehended in

8   existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562

9   U.S. 86, 103 (2011).

10          Thus, "[o]n federal habeas review, AEDPA imposes a highly deferential standard for

11   evaluating state-court rulings and demands that state-court decisions be given the benefit of the

12   doubt." *Felkner v. Jackson,* 562 U.S. 594, 598 (2011) (citation and internal quotation marks

13   omitted).  However, "when a state court employs the wrong legal standard, the AEDPA rule of

14   deference does not apply." *Cooperwood v. Cambra*, 245 F.3d 1042, 1046 (9th Cir. 2001); *see*

15   *also Tarango v. McDaniel*, 837 F.3d 936, 945 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 1816

16   (2017).

17          Where the criteria set forth in § 2254(d)(1) is satisfied (i.e., where the state court's

18   adjudication of the petitioner's claim "resulted in a decision that was contrary to, or involved an

19   unreasonable application of, clearly established federal law"), the federal court conducts a *de*

20   *novo* review of the petitioner's habeas claims.  *See Panetti v. Quarterman*, 551 U.S. 930, 948

21   (2007) (reviewing "petitioner's underlying incompetency claim [] unencumbered by the

22   deference AEDPA normally requires" because the state court's competency determination

23   constituted an unreasonable application of clearly established federal law); *Delgadillo v.*

24   *Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) ("Only if the state court's decision does not meet

25   the criteria set forth in § 2254(d)(1) do we conduct a *de novo* review of a habeas petitioner's

26   claims."); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (*en banc*) ("[I]t is now

27   clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if

28   /////

4

1  there is such error, we must decide the habeas petition by considering *de novo* the constitutional

2  issues raised.").

3       "The relevant state court determination for purposes of AEDPA review is the last

4  reasoned state court decision." *Delgadillo*, 527 F.3d at 925 (citing *Ylst v. Nunnemaker*, 501 U.S.

5  797, 804–05 (1991)).  "[I]f the last reasoned decision adopts or substantially incorporates the

6  reasoning from a previous state court decision, [the court] may consider both decisions to 'fully

7  ascertain the reasoning of the last decision.'" *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th

8  Cir. 2007) (citation omitted); *see also Ayala v. Chappell*, 829 F.3d 1081, 1094 (9th Cir. 2016)

9  ("We apply AEDPA's standards to the state court's last reasoned decision on the merits of a

10  petitioner's claims.").

11                                       **ANALYSIS**

12  **A.      Petitioner's *Batson* Claim**

13           1.      <u>*Batson* Legal Framework</u>

14       It is clearly established law under Supreme Court precedent that "the Equal Protection

15  Clause forbids the prosecutor to challenge potential jurors solely on account of their race."

16  *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).  In *Batson*, the Supreme Court enumerated three

17  steps, "which together guide trial courts' constitutional review of peremptory strikes." *Johnson v.*

18  *California*, 545 U.S. 162, 168 (2005).

19  20  21  22  23
> [The] three *Batson* steps should by now be familiar.  First, the defendant must make out a *prima facie* case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.  Second, once the defendant has made out a *prima facie* case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes.  Third, if a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination.

24  *Id.* (internal brackets, quotations, citations, and footnotes omitted).[2]  In *Johnson*, the Supreme

25  Court clarified the scope of *Batson*'s step one and reiterated that "a defendant satisfies the

---

[2]  The three-step *Batson* framework was clearly established Supreme Court law at the time of petitioner Arciga's trial in 2012 and his direct appeal in 2014.  *See Williams v. Runnels*, 432 F.3d 1102, 1105 n.5 (9th Cir. 2006) (noting that "the Supreme Court clearly indicates in *Johnson* that it is clarifying *Batson*, not making new law") (citing *Johnson*, 545 U.S. at 168–69).

1  requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to

2  draw an inference that discrimination has occurred." *Id.* at 170.

3     The question presented to the Supreme Court in *Johnson* was "whether *Batson* permits

4  California to require at step one that 'the objector must show that it is more likely than not the

5  other party's peremptory challenges, if unexplained, were based on impermissible group bias.'"

6  *Id.* at 167–68.  This standard—referred to interchangeably as the "strong likelihood" or the "more

7  likely than not"—standard, was articulated by the California Supreme Court in *People v.*

8  *Wheeler*, 22 Cal. 3d 258, 280–81 (1978) and *People v. Box*, 23 Cal. 4th 1153, 1188 n.7 (2000)

9  and its progeny.  *See id.*  Relying on those cases, the California Supreme Court had held that its

10 "strong likelihood" standard was the same as *Batson*'s "reasonable inference" standard, and thus,

11 according to the California Supreme Court's reasoning, *Batson* "permits a court to require the

12 objector to present, not merely 'some evidence' permitting the inference, but 'strong evidence'

13 that makes discriminatory intent *more likely than not* if the challenges are not explained." *Id.* at

14 167 (quoting *People v. Johnson*, 30 Cal. 4th 1302, 1316 (2003)); *see also People v. Johnson*, 30

15 Cal. 4th at 1313 ("We reiterate what we implied in *Wheeler* and stated in *Box*:  *Wheeler*'s terms

16 "strong likelihood" and "reasonable inference" state the same standard.").  In *People v. Johnson*

17 and *Box*, the California Supreme Court also stated that where a trial court denies a *Wheeler*

18 motion because it finds that no *prima facie* case of group bias was established, the reviewing

19 court is to affirm that ruling if the voir dire "record suggests grounds on which the prosecutor

20 might reasonably have challenged the jurors."  *People v. Johnson*, 30 Cal. 4th at 1325 *rev'd sub*

21 *nom. Johnson v. California*, 545 U.S. 162 (2005); *People v. Box*, 23 Cal. 4th at 1188.

22    After granting certiorari in *Johnson*, however, the United States Supreme Court reversed

23 the California Supreme Court's judgment and explicitly rejected its reasoning and its holding that

24 the state's "strong likelihood" standard is the same as the "reasonable inference" standard

25 required by *Batson*.  *Johnson*, 545 U.S. at 166–170.  Rather, the Supreme Court concluded "that

26 California's 'more likely than not standard' is an inappropriate yardstick by which to measure the

27 sufficiency of a *prima facie* case," and "is at odds with the *prima facie* inquiry mandated

28 by *Batson*."  *Id.* at 168, 173.  The United States Supreme Court explained that:

> in describing the burden-shifting framework, we assumed in *Batson* that the trial judge would have the benefit of all relevant circumstances, including the prosecutor's explanation, before deciding whether it was more likely than not that the challenge was improperly motivated. We did not intend the first step to be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination.

*Id.* at 170. The Supreme Court also emphasized the importance of *Batson* steps two and three, and of proceeding with each of the three *Batson* steps in the proper order, explaining that "the *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process." *Id.* at 172.

With regard to *Batson*'s second step, the Supreme Court noted that "[t]he inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." *Id.* at 172 (citing *Paulino v. Castro*, 371 F.3d 1083, 1090 (9th. Cir. 2004) ("[I]t does not matter that the prosecutor might have had good reasons . . . [;] [w]hat matters is the real reason they were stricken") (emphasis deleted); *Holloway v. Horn*, 355 F.3d 707, 725 (3rd Cir. 2004) (speculation "does not aid our inquiry into the reasons the prosecutor actually harbored" for a peremptory strike)). "[T]he rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." *Miller-El v. Dretke*, 545 U.S. 231, 251–52 (2005) ("*Miller-El II*") ("[W]hen illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A *Batson* challenge does not call for a mere exercise in thinking up any rational basis.").

At *Batson*'s third step, the burden shifts back to the defendant to demonstrate that the race-neutral reason given by a prosecutor was pretextual and that the use of peremptory strikes was motivated by race. *Purkett v. Elem*, 514 U.S. 765, 767 (1995) ("If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination."); *see also Miller-El II*, 545 U.S. at 239 ("The trial court then will have the duty to determine if the defendant has established purposeful discrimination.")

1  (quoting *Batson*, 476 U.S. at 98).  Indeed, "[i]t is not until the third step that the persuasiveness of

2  the justification becomes relevant—the step in which the trial court determines whether the

3  opponent of the strike has carried his burden of proving purposeful discrimination." *Purkett*, 514

4  U.S. at 768.  This is because "the ultimate burden of persuasion regarding racial motivation rests

5  with, and never shifts from, the opponent of the strike." *Id.*  Nevertheless, it is only at step three

6  that the burden falls to defendant to convince the trial court that racial discrimination is occurring

7  in the prosecution's employment of its peremptory strikes.  *See Snyder v. Louisiana*, 552 U.S.

8  472, 485 (2008); *Miller-El II*, 545 U.S. at 239; *Johnson*, 545 U.S. at 170.

9         2.    <u>Whether the Decision by the California Court of Appeals Affirming The Denial of</u>

10                 <u>Petitioner's *Batson* Motion was Contrary to Clearly Established Federal Law</u>

11        As summarized in the pending findings and recommendations, petitioner appealed his

12  judgment and conviction to the California Court of Appeal for the Fifth Appellate District ("Fifth

13  DCA"), which affirmed the trial court's judgment on April 11, 2014.  (Doc. No. 30 at 2.)

14  Petitioner filed a petition for review in the California Supreme Court, which summarily denied his

15  petition on June 25, 2014.  (*Id.*)  Accordingly, the last reasoned state court decision relevant to

16  this federal court's habeas review is the Fifth DCA's decision:  *People v. Arciga*, No. F064382,

17  2014 WL 1400962, at *2 (Cal. Ct. App. Apr. 11, 2014).  *See Delgadillo*, 527 F.3d at 925 (citing

18  *Ylst*, 501 U.S. at 804–05).

19        The pending findings and recommendations appear to conclude that the Fifth DCA's

20  decision is entitled to AEDPA deference.  (Doc. No. 30 at 13–14) (concluding that "[p]etitioner

21  fails to rebut the presumption that the state court's finding was correct"; "[p]etitioner has not

22  shown the [state appellate] court's determination of [race-neutral reasons for each challenge] to

23  be unreasonable"; and "a fair-minded jurist could conclude that the trial judge did not err when it

24  did not find an inference of purposeful discrimination"; and "fair minded jurists could differ on

25  whether statistics here would be sufficient").  However, in reaching this conclusion, the pending

26  findings and recommendations do not discuss the legal standard that the state appellate court

27  applied in reviewing the state trial court's denial of petitioner's *Batson* motion, nor do they

28  analyze whether the Fifth DCA employed the wrong legal standard (i.e., a standard that is

1   contrary to clearly established federal law). The undersigned begins with addressing this critical

2   question because "when a state court employs the wrong legal standard, the AEDPA rule of

3   deference does not apply." *Cooperwood*, 245 F.3d at 1046; *see also Panetti*, 551 U.S. at 948 (a

4   state court's failure to apply the proper standard under clearly established federal law "allows

5   federal-court review . . . without deference to the state court's decision" and "unencumbered by

6   the deference AEDPA normally requires."); *Tarango*, 837 F.3d at 945; *Castellanos v. Small*, 766

7   F.3d 1137, 1146 (9th Cir. 2014) ("If the state court applies a legal standard that contradicts clearly

8   established federal law, we review *de novo* the applicant's claims, applying the correct legal

9   standard to determine whether the applicant is entitled to relief.").

10          If the Fifth DCA employed the wrong legal standard, then this court must review

11   petitioner's *Batson* claim *de novo*. *See Johnson v. Finn*, 665 F.3d 1063, 1068–69 (9th Cir. 2011)

12   (where the state court employed the wrong standard for reviewing a *Batson* claim, the state

13   court's findings are not entitled to deference and the federal court reviews the claim *de novo*)

14   ("*Finn*").[3] For the reasons explained below, the undersigned concludes that the state appellate

15   court did apply the wrong legal standard in reviewing the trial court's denial of petitioner's

16   *Batson* claim.

17          Although the Fifth DCA briefly summarized *Batson*'s three-step framework and cited to

18   the United States Supreme Court's decision in *Johnson* to describe the *prima facie* showing that a

19   defendant must make at *Batson* step one, *see Arciga*, 2014 WL 1400962, at *2–3, that court

20   nevertheless applied the wrong legal standard in reviewing the trial court's determination that

21   petitioner had failed to make a *prima facie* showing of racial discrimination in the prosecution's

22   use of peremptory challenges during jury selection. Specifically, the Fifth DCA explicitly stated

23   the legal standard that it was applying in its review as follows:

24                  When a trial court denies a *Wheeler* motion without finding a *prima
                    facie* case of group bias, the appellate court reviews the record of
25                  voir dire for evidence to support the trial court's ruling. We will

26   _____

27   [3]  To avoid confusion with citations to the U.S. Supreme Court case *Johnson v. California*, the
     court will use "Finn" as the case name in subsequent citations to the Ninth Circuit's decision in
28   *Johnson v. Finn*.

1

2
> affirm the ruling where the record suggests grounds upon which the
> prosecutor might reasonably have challenged the jurors in question.

3 *Arciga*, 2014 WL 1400962, at *4 (quoting *People v. Pearson*, 56 Cal. 4th 393, 421 (2013)).

4 Based on this legal standard, the Fifth DCA "turn[ed], therefore, to the voir dire transcript to seek

5 evidence of grounds upon which the prospective jurors might reasonably have been challenged"

6 and held "that there were adequate reasons other than racial discrimination for each challenge."

7 *Id.* That is, the Fifth DCA affirmed the trial court's ruling because "the record of voir dire

8 contains grounds upon which the prosecutor could reasonably challenge the[] ten prospective

9 jurors," and "even if a statistical disparity exists, a ruling of no *prima facie* case should be

10 affirmed if the 'record suggests that the prosecutor had . . . race neutral reasons' for excusing the

11 jurors." *Id.* at *6–7 (quoting *Pearson*, 56 Cal. 4th at 422).  The Fifth DCA's decision relies

12 exclusively on this quoted language from the California Supreme Court's decision in *Pearson*,

13 which, in turn quoted *People v. Guerra*, 37 Cal. 4th 1067, 1101 (2006), which in turn quoted

14 *People v. Farnam*, 28 Cal. 4th 107, 135 (2002), which itself relies on the California Supreme

15 Court's decision articulating the "strong likelihood" standard stated in *People v. Box*, 23 Cal. 4th

16 1153 (2000).  As noted above, however, in *Johnson*, the United States "Supreme Court squarely

17 rejected that doctrine of California law as contrary to *Batson*."  *Finn*, 665 F.3d at 1068.

18        That is, a state appellate court clearly acts contrary to clearly established federal law when

19 it bases its *prima facie* analysis on the discredited standard articulated by the California Supreme

20 Court in *Box*.  *Shirley v. Yates*, 807 F.3d 1090, 1101 (9th Cir. 2015), as amended (Mar. 21, 2016)

21 ("We have made clear, [] that *Box* imposes too high a burden, and that state court decisions

22 applying it do not warrant deference under AEDPA, because they are 'contrary to . . . clearly

23 established Federal law.'") (citing 28 U.S.C. § 2254(d)(1)).  Thus, in *Shirley*, the Ninth Circuit

24 held that the district court correctly concluded that the state appellate court's analysis was

25 contrary to clearly established law because it relied on *Box*'s statement that "when the record

26 suggests grounds upon which the prosecutor *might reasonably have challenged the jurors in*

27 *question*, we affirm."  *Id.* (emphasis added).  The Ninth Circuit affirmed the district court's

28 reasoning that:

1
2
3
4
5
6

> [t]he statement from *Box* is contradicted by the Supreme Court's holdings in *Batson* and *Johnson*. *Box* bound the Court of Appeal to deny the *Batson* claim even if petitioner raised an inference of discrimination, if there was some ground upon which the prosecutor might have legitimately challenged the jurors. Misguided by this rule, the Court of Appeal went on to speculate about possible race-neutral reasons Shirley's prosecutor might have had for the strikes. This kind of speculation is precisely what the Supreme Court forbids: "The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained."

7   *Shirley v. Yates*, No. 2:07-cv-01800-AK, 2013 WL 394713, at *2 (E.D. Cal. Jan. 30, 2013)

8   (quoting *Johnson*, 545 U.S. at 172).

9          Here, the Fifth DCA also relied on the statement from *Box*—although it cited to the

10   decision in *Pearson*, the quoted statement remains the same. *Arciga*, 2014 WL 1400962, at *4.

11   The Fifth DCA reviewed the voir dire transcript to identify "grounds upon which the prospective

12   jurors might reasonably have been challenged," and having come up with its own "adequate

13   reasons other than racial discrimination for each challenge," affirmed the trial court's denial of

14   petitioner's *Batson* motion on that basis. *Id.* Accordingly, the Fifth DCA based its analysis on a

15   wholly discredited legal standard, and thus its decision is contrary to clearly established federal

16   law. *See Finn*, 665 F.3d 1069 ("The existence of 'grounds upon which a prosecutor could

17   reasonably have premised a challenge,' does not suffice to defeat an inference of racial bias at the

18   first step of the *Batson* framework."); *see also Currie v. McDowell*, 825 F.3d 603, 609 (9th Cir.

19   2016) (concluding that the "state appellate court violated clearly established Federal law in its

20   *Batson* step one analysis by affirming because 'the record suggest[ed] grounds upon which the

21   prosecutor might reasonably have challenged the jurors in question,' whether or not those were

22   the reasons proffered") (citation omitted); *Williams*, 432 F.3d at 1109 ("[T]he California Court of

23   Appeal [] reviewed all the evidence in the record concerning the challenged jurors and

24   determined that the record contained evidence for each juror that would support peremptory

25   challenges on non-objectionable grounds. This, however, does not measure up to the Supreme

26   Court's pronouncement that the question is not whether the prosecutor might have had good

27   reasons, but what were the prosecutor's real reasons for the challenges.").

28   /////

1    In addition, the Fifth DCA applied the wrong legal standard when it concluded that even if

2  a statistical disparity exists, a trial court's ruling that a defendant has not made a *prima facie* case

3  should be affirmed if the record suggests that the prosecutor had race neutral reasons.  *See*

4  *Williams*, 432 F.3d at 1108 (under *Batson* and *Johnson*, "to rebut an inference of discriminatory

5  purpose based on statistical disparity, the 'other relevant circumstances' must do more than

6  indicate that the record would support race-neutral reasons for the questioned challenges") (citing

7  *Batson*, 476 U.S. at 96; *Johnson*, 545 U.S. at 169–70).

8    Having concluded that the Fifth DCA applied the wrong legal standard, one discredited by

9  the United States Supreme Court, and that its decision is therefore not entitled to AEDPA

10  deference, the undersigned will proceed to analyze petitioner's *Batson* claim *de novo*.  *See*

11  *Shirley*, 807 F.3d at 1101 (concluding that "it was appropriate for the district court to determine

12  *de novo* whether the petitioner had raised an inference of racial bias" after the district court

13  concluded that the state court applied the wrong legal standard to petitioner's *Batson* claim); *see*

14  *also Kitlas v. Haws*, No. 2:08-cv-6651-GHK-LAL, 2016 WL 8722641, at *17 (C.D. Cal. May 13,

15  2016), *report and recommendation adopted*, 2016 WL 8732524 (C.D. Cal. Sept. 23, 2016), *aff'd*,

16  736 F. App'x 158 (9th Cir. 2018) (applying *de novo* review of a *Batson* claim where "the state

17  appellate court's decision cited and acknowledged the correct standard" but "applied a more

18  onerous standard" under the discredited "California rule that when a trial court denies

19  a *Wheeler* motion without finding a *prima facie* case of group bias, the reviewing court must

20  affirm if the record suggests grounds upon which the prosecutor might reasonably have

21  challenged the jurors in question").[4]

22

23  ───────────

[4]  The court pauses to note that the California Supreme Court has subsequently recognized that
the United States Supreme Court has discredited the legal standard which it had previously
24  employed in this regard.  *People v. Sanchez*, 63 Cal. 4th 411, 435 (2016) ("*Shirley* and *Williams*
appear correct that under *Johnson*, reviewing courts may not uphold a finding of no *prima facie*
25  case simply because the record suggests grounds for a valid challenge.").  But the California
Supreme Court appears to have attempted to reconcile its decisions by distinguishing the
26  impermissible standard of reviewing the record for race-neutral grounds with what it deems to be
a permissible standard of reviewing the record for "reasons clearly established in the record,"
27  "readily apparent reasons," and "*obvious* race-neutral reasons" that dispel any inference of bias.
*Id.* ("[W]e believe *Johnson* permits courts to consider, as part of the overall relevant
28

3.    *De Novo* Review of Petitioner's *Batson* Claim

a.    *Batson* *Step One – Prima Facie Case*

To make a *prima facie* showing under *Batson*'s first step, a defendant "must show that: (1) the prospective juror is a member of a 'cognizable racial group,' (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was on account of race." *Crittenden v. Ayers*, 624 F.3d 943, 955 (9th Cir. 2010) (quoting *Batson*, 476 U.S. at 96). Here, it is undisputed that the prosecutor at petitioner's trial used 10 of 15 peremptory challenges to strike jurors with Spanish surnames. (Doc. No. 14 at 17–18.) Thus, the only remaining question at step one is whether petitioner has met the minimal

/////

---

circumstances, nondiscriminatory reasons clearly established in the record that necessarily dispel any inference of bias."); *see also People v. Rhodes*, 8 Cal. 5th 393, 430 (2019) ("By referring to 'readily apparent' grounds for the strikes, we do not mean merely that we can imagine race-neutral reasons the prosecutors might have given if required to do so at the second step of the *Batson* inquiry.") However, some justices of that court have dissented in these cases and argued that even this approach is inconsistent with and contrary to United States Supreme Court authority. *See Rhodes*, 8 Cal. 5th at 457 (Liu, J., dissenting) ("[T]his mode of analysis—hypothesizing reasons for the removal of minority jurors as a basis for obviating inquiry into the prosecutor's actual reasons—has become a staple of our *Batson* jurisprudence, and it raises serious concerns. . . .  If an inference of bias is to be dispelled, it is up to the prosecutor to dispel it by stating credible, race-neutral reasons for the strikes.  It is not the proper role of courts to posit reasons that the prosecutor might or might not have had.") (citing *Johnson v. California*, 545 U.S. at 173); *see also People v. Johnson*, 8 Cal. 5th 475, 536 (2019) (Liu, J., dissenting) ("[W]e must not elevate the standard for establishing a *prima facie* case beyond the showing that the high court has deemed sufficient to trigger a prosecutor's obligation to state the actual reasons for the strike.  Viewing today's decision in its particulars and in the broader context of our case law, I continue to have serious doubts as to whether our jurisprudence has held true to *Batson*'s mandate.") (internal quotations and citations omitted).  The analysis and reasoning in these dissenting opinions are as compelling as they are troubling with regard to the state of *Batson* jurisprudence in California.  However, the undersigned need not wade into this debate because in petitioner Arciga's case, the Fifth DCA did not base its decision on having identified "readily apparent" or "obvious" race neutral grounds that dispel any inference of bias.  Rather, the Fifth DCA merely found that the record of voir dire contains grounds upon which the prosecutor might reasonably have challenged each juror and simply ended its analysis there.  The Fifth DCA neither considered whether those grounds were readily apparent or obvious, nor whether they served to dispel any inference of bias raised by the significant statistical disparity in the prosecutor's use of 10 of 15 preemptory challenges to strike Spanish-surnamed jurors.  Accordingly, the question of whether a state court applies the wrong legal standard in evaluating a *Batson* motion if it bases its decision on "obvious" race-neutral reasons is not a question raised by the pending petition or answered in this order.

13

1  burden of "producing evidence sufficient to permit the trial judge to draw an inference that

2  discrimination has occurred." *Johnson*, 545 U.S. at 170.

3     "[A] *prima facie* case of discrimination can be made out by offering a wide variety of

4  evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory

5  purpose.'" *Id.* at 169 (quoting *Batson*, 476 U.S. at 94).  The totality of the circumstances and the

6  variety of evidence includes:  the prosecutor's questions and statements during voir dire, whether

7  the prosecutor engaged in meaningful questioning before striking jurors belonging to that racial

8  group, whether a pattern exists of striking prospective jurors of that racial group, and a

9  comparison of the stricken jurors with jurors who were not stricken.  *See Batson*, 476 U.S. at 96–

10  97 ("[A] 'pattern' of strikes against [minority] jurors included in the particular venire might give

11  rise to an inference of discrimination."); *id.* ("[T]he prosecutor's questions and statements

12  during *voir dire* examination and in exercising his challenges may support or refute an inference

13  of discriminatory purpose."); *United States v. Collins*, 551 F.3d 914, 921 (9th Cir. 2009) ("[T]he

14  fact that the prosecutor fails to 'engage in meaningful questioning of any of the minority jurors'

15  might indicate the presence of discrimination.") (citation omitted); *Boyd v. Newland*, 467 F.3d

16  1139, 1149 (9th Cir. 2006) ("[B]ecause comparative juror analysis assists a court in determining

17  whether the totality of the circumstances gives rise to an inference of discrimination, we believe

18  that this analysis is called for on appeal even when the trial court ruled that the defendant failed to

19  make a *prima facie* showing at the first step of the *Batson* analysis.").

20     In addition, "[a] defendant can make a *prima facie* showing based on statistical disparities

21  alone."  *Paulino*, 371 F.3d at 1091.  For example, a *prima facie* showing may be based solely on

22  statistical evidence that prospective jurors of a particular race were disproportionately stricken

23  from the jury panel.  *See Miller-El v. Cockrell*, 537 U.S. 322, 342 (2003) ("*Miller-El I*") ("In this

24  case, the statistical evidence alone raises some debate as to whether the prosecution acted with a

25  race-based reason when striking prospective jurors" where 10 of the prosecutor's 14 peremptory

26  strikes were used against African-Americans, noting that "[h]appenstance is unlikely to produce

27  this disparity.").  A *prima facie* showing may also be made where a high percentage of the total

28  number of minority jurors in the jury pool are stricken.  *See Shirley*, 807 F.3d at 1101 (affirming

14

the district court's determination that the petitioner had raised an inference of racial bias where "two-thirds of the black veniremembers not removed for cause were struck by the prosecutor" and noting that inferences of discrimination have been found "where smaller percentages of minority veniremembers were peremptorily struck") (citing *Fernandez v. Roe*, 286 F.3d 1073, 1078 (9th Cir. 2002) (56%); *Turner v. Marshall*, 63 F.3d 807, 812 (9th Cir. 1995) (56%), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999) (*en banc*); *accord United States v. Alvarado*, 923 F.2d 253, 255 (2d Cir. 1991) (57%)); *see also Turner*, 63 F.3d at 813 (concluding that the petitioner had established a *prima facie* case of a *Batson* violation because two different statistics—the percentage of available African-Americans challenged, and the percentage of peremptory challenges used against African-Americans— provide support for an inference of discrimination").

The Ninth Circuit has routinely concluded that significant statistical disparities raise an inference of discrimination.  In *Turner*, for instance, the Ninth Circuit held that an inference of discrimination was raised in that case by two statistics:  (1) the prosecutor "used peremptory challenges to exclude five African-Americans out of a possible nine African-American venirepersons" (55.5%), and (2) "[o]ut of the nine peremptory challenges made by the prosecution, five were made against African-Americans."  *Id.* at 812–13.  The Ninth Circuit explained that "[a]lthough the record lack[ed] statistics on the racial makeup of the venire as a whole, approximately 30 percent (11 out of 37) of the venirepersons who appeared before the court for voir dire were African-American.  Yet the government used a significantly higher percentage of its peremptory challenges—56 percent—against African-Americans.  Such a disparity also supports an inference of discrimination."  *Id.* at 813 (citing *Alvarado*, 923 F.2d at 255–56 (finding a *prima facie* case because the prosecution challenged 50% of minority venirepersons, who represented only 30% of the pool)).  In *Fernandez*, the Ninth Circuit analogized to *Turner* and similarly found that an inference of discrimination had been raised by the statistical disparities alone, stating:

> [t]he statistical evidence in this case is comparable to *Turner* as to both the proportion of available minorities stricken and the relative rate of such strikes.  The prosecutor struck four out of seven (57%)

Hispanics, slightly greater than the percentage in *Turner*, thus supporting an inference of discrimination. While Hispanics constituted only about 12% of the venire, 21% (four out of nineteen) of the prospective juror challenges were made against Hispanics. At the time of the first *Wheeler* motion, after which the judge in effect warned the prosecutor not to strike any more Hispanics, the prosecutor had exercised 29% (four out of fourteen) of his challenges against Hispanics. Therefore, the prosecutor disproportionately struck Hispanics from the jury box, resulting in a statistical disparity similar to that in *Turner*. Those challenges, standing alone, are enough to raise an inference of racial discrimination.

286 F.3d at 1078. Finally, in *Williams*, the Ninth Circuit held that a petitioner had raised an inference of discrimination because the "bare facts present[ed] a statistical disparity" where "the prosecutor used three of his first four peremptory challenges to remove African-Americans from the jury" and "it appears that only four of the first forty-nine potential jurors were African-American." 432 F.3d at 1107 (reversing and remanding a district court's denial of a federal habeas petition because the district court had "failed to appreciate the import of [petitioner's] showing of statistical disparity").

"It is true that statistical disparity alone does not end the inquiry; *Batson* held that we must 'consider *all* relevant circumstances.'" *Finn*, 665 F.3d at 1071 (citing *Batson*, 476 U.S. at 96). Importantly, however, in conducting a review of the totality of the circumstances at step one, courts must be mindful that

[t]he existence of legitimate race-neutral reasons for a peremptory strike can rebut at Batson's second and third steps the prima facie showing of racial discrimination that has been made at the first step. But it cannot negate the existence of a prima facie showing in the first instance, or else the Supreme Court's repeated guidance about the minimal burden of such a showing would be rendered meaningless.

*Id.* at 1070–71.

Here, for the reasons that follow, the undersigned concludes that petitioner Arciga has made a *prima facie* showing of racial discrimination in the prosecutor's use of peremptory strikes at his trial because there is a statistical disparity significant enough—10 of 15 strikes (66.6%)—that it alone raises an inference of bias, and that inference is not dispelled by consideration of the totality of the circumstances.

i.     Statistical Disparity

As to the statistical disparity in the prosecutor's use of peremptory strikes, the state court record[5] reveals the following:

There were 70 prospective jurors in the panel at the start of jury selection; 24 of whom had Spanish surnames (34.2%).[6]   (Doc. No. 38—sealed.)   In the process of selecting the 12 regular jurors, the court reached the 56th prospective juror on the list of 70.   (12 ART at 103.)   Of those 56 prospective jurors, 20 had Spanish surnames (35.7%).   Of this group of 56, six received hardship deferrals, two of whom had Spanish surnames.[7]   (*See* 12 ART at 20–23.)   Of the

[5]   On February 25, 2016, respondent lodged several appellate court records, including, relevant here, the augmented reporter's transcript of jury selection.   (Doc. No. 19 at 2) (lodging "12. Augmented Reporter's Transcript on Appeal, dated January 6, [afternoon] 9, 10, and 17, 2012" and "13. Augmented Reporter's Transcript on Appeal, dated January [morning] 9, 2012").   The page numbering on these transcripts is not consecutive, as each of these documents begins with its own page one.   To avoid confusion, this court cites in this order to these lodged documents as "12 ART" and "13 ART" with pincites to the transcript's page numbers, e.g., 12 ART at 55.

[6]   Because the augmented reporter's transcript "reflects the redaction of the identities of certain jurors, either by using seat numbers or by using juror numbers," in order to meaningfully review the record, this court directed respondent to lodge additional documents containing personal identifying information of the jurors in this matter under seal.   (Doc. No. 34.)   In response to the court's order, respondent lodged under seal a copy of the master jury list showing the names of all 70 prospective jurors.   (Doc. No. 38—sealed.)   As reflected on that master jury list, the following twenty-four prospective jurors had Spanish surnames:   juror Nos. 1, 8, 9, 12, 14, 15, 22, 24, 25, 28, 31, 32, 35, 41, 46, 48, 50, 51, 54, 56, 58, 62, 64, and 69.   In this order, the court refers to the prospective jurors by their number, not their name.   However, because the court necessarily cross-referenced the master jury list with the ART, any citation to the ART that omits juror name information is intended to incorporate by reference the lodged master jury list as well.

[7]   In its decision rejecting petitioner's *Batson* claim on direct appeal, the Fifth DCA incorrectly recounted that only 4 of the 56 prospective jurors received hardship referrals.   *Arciga*, 2014 WL 1400962, at *2.   However, the trial transcript reflects that the trial judge ultimately granted 8 hardship requests from the total pool of 70 prospective jurors (six of whom were from the subset of 56 prospective jurors considered in selecting the regular jurors).   Contrary to the Fifth DCA's apparent reading of the trial transcript, the trial judge did not rule on the hardship requests by first announcing all of the granted deferrals and then second by announcing the denied requests.   Rather, the trial judge first excused four prospective jurors (Nos. 9, 53, 43, 6) based on hardship, then denied a hardship request by prospective juror No. 21, excused prospective juror No. 12, denied hardship requests by prospective jurors Nos. 41 and 10, excused prospective juror No. 36, denied hardship requests by prospective jurors Nos. 18 and 38, excused prospective juror No. 64, denied hardship a request by prospective jurors No. 31, excused prospective juror No. 59, and denied hardship requests by prospective jurors Nos. 39 and 24.   (*See* 12 ART at 20–23.)

remaining 50 prospective jurors, 18 had Spanish surnames (36%).  Before the parties began exercising their peremptory strikes, five prospective jurors had been stricken for cause, one of whom had a Spanish surname.  (13 ART at 40.)  Another prospective juror with a Spanish surname was stricken for cause during voir dire of the panel.  (13 ART at 47–48.)  In the first two rounds of peremptory challenges, when the jury panel as then constituted consisted of 24 prospective jurors, eight of whom had Spanish surnames (33.3%), the prosecutor used five of her first seven strikes (71.4%) on prospective jurors with Spanish surnames.  (13 ART at 41, 92.)  During those round of challenges, the defense struck six jurors, two of whom had Spanish surnames.  (*Id.*)  In the third round, the jury panel was re-constituted and consisted of 21 prospective jurors, only three of whom had Spanish surnames (14.3%).  The prosecutor then exercised two of her next four strikes (50%) on prospective jurors with Spanish surnames— leaving only one Spanish-surnamed juror remaining on the panel.  (12 ART at 100–102.)  In the fourth and final round of challenges, after replacing a final juror who was excused for cause,[8] the jury panel was again re-constituted and consisted of 21 prospective jurors, seven of whom had Spanish surnames (33.3%).  (12 ART at 102, 103.)  In that final round of peremptory challenges, the prosecutor exercised three of her four last strikes (75%) on prospective jurors with Spanish surnames, and the defense struck five prospective jurors, two of whom had Spanish surnames.  (12 ART 130–132.)

By the end of jury selection, the prosecutor had used 10 of 15 strikes (66.6%) against prospective jurors with Spanish surnames, even though the juror pool in total consisted of 36% Spanish-surnamed jurors, and when exercising her strikes, the re-constituted panels consisted of 33.3%, 14.3%, and 33.3% Spanish-surnamed jurors, respectively.  Put another way, of the 43 prospective jurors who remained after hardships deferrals and excusals for cause and who were considered for seating on the trial jury, 16 of them had Spanish surnames—the prosecutor struck 10 of those 16 (62.5%).  In contrast, the defense used only four of his 16 strikes (25%) on

---

[8]  In all, a total of seven prospective jurors were excused for cause, two of whom had Spanish surnames.  (*See* 12 ART at 103; 13 ART at 40, 47–48.)

1    prospective jurors with Spanish surnames.  Ultimately, only two jurors with Spanish surnames

2    (16.6%) served on the jury of 12 who were sworn.[9]

3         This statistical disparity, when viewed both in total and in its component parts, is certainly

4    sufficient to give rise to an inference of discriminatory purpose.  *See Miller-El I*, 537 U.S. at 342

5    (such an inference was raised where "10 of the prosecutor's 14 peremptory strikes were used

6    against African-Americans"); *Shirley*, 807 F.3d at 1101 (an inference of the discriminatory use of

7    peremptory challenges was raised where "two-thirds of the black veniremembers not removed for

8    cause were struck by the prosecutor").  Having concluded that an inference of discrimination has

9    been raised by the statistical disparities in the prosecutor's exercise of peremptory challenges, the

10   court now turns to consider whether other relevant circumstances dispel that inference.  *See Finn*,

11   665 F.3d at 1071.

12                         ii.        Other Relevant Circumstances

13        First, to place statistical disparities in context, one circumstance that courts consider is the

14   timing of when a *Batson* motion is made in comparison with the timing and pattern of the

15   prosecutor's strikes.  *See Fernandez*, 286 F.3d at 1078 (analyzing percentages at the close of voir

16   dire and at the time the *Wheeler* motion was made).  Here, consideration of that circumstance is

17   limited because the timing of petitioner's *Batson* motion is not clear in the trial court record,

18   which reflects only the following statement by the trial judge (made after the alternate jurors were

19   sworn and all jurors were released for the day):

> We remain on the record.  The record should reflect at one of our
> breaks when I believe when we were going back to challenges for
> cause, [defense counsel] raised a *Batson-Wheeler* motion.  He made
> the motion formally.  I will now document that motion.  I ruled
> then, and regardless of whatever point it was in the trial, I believe it
> was after the exercise of Juror Number [24] - - but it may have been
> later than that – but whatever stage it was, I considered it to be an
> ongoing motion.

---

[9]  After the trial jury was selected, the court proceeded with voir dire and selection of three alternate jurors from a remaining panel of nine prospective jurors, two of whom had Spanish surnames.  (12 ART at 136.)  After a bench discussion had off the record, the trial judge announced that the parties had, "through a process, selected jurors No. 58, 60, and 61 to serve as alternate jurors."  (12 ART at 160–161.)  One of the agreed-upon alternate jurors had a Spanish surname.  (*Id.*)

I'm ruling at this point there has not been a showing of a *prima facie* case of exclusion.  I recognize that of the 15 jurors excused by the defense, a significant portion bore Hispanic surnames; however, I did my best to keep track and keep notes.  Based upon these jurors' answers, it does not appear that none - - there was not a pattern of discrimination based upon the racial makeup of the jurors standing alone.

There has been no showing that the People exercised their peremptory challenges in a racially discriminatory manner.  I won't even ask the People to make a response, but I have independently based upon my notes, feel and rule that there has been no showing made.

(12 ART 163–64.)[10]  The *defense* struck prospective juror No. 24 during the second round of peremptory challenges, and the prosecutor struck a prospective juror with a Spanish surname immediately thereafter.  (13 ART at 94.)  The record reflects that the court then reconstituted the jury and paused proceedings to "take just a moment to speak to the attorneys."  (*Id.*)  It is possible that during this break, defense counsel raised the *Batson* motion.  At that time, the prosecutor had already exercised five of seven strikes (71.4%) on prospective jurors with Spanish surnames.  Thus, it would seem that even then, assuming the *Batson* motion was made at that time by the defense, a statistical disparity existed sufficient to raise an inference of discrimination.  The record reflects another possibility with regard to the timing of the defense *Batson* motion.  That is, during the final round of peremptory challenges, defense counsel requested a side bar

---

[10]  Because this court reviews petitioner's *Batson* claim *de novo*, the court need not dwell on any perceived deficiencies in the state trial court's decision to deny petitioner's *Batson* motion at step one.  Though it is worth noting that the record suggests that the trial judge did not consider whether the facts gave rise to an *inference* of discrimination; indeed, the record suggests that the trial judge considered only whether there was a "pattern" of discrimination.  (On that question, the trial judge concluded that 10 of 15 strikes was insufficient to evidence such a pattern without further explanation.)  Nonetheless, while a pattern of discriminatory strikes is a circumstance that is to be considered and may support a *prima facie* showing of discrimination, such a pattern is clearly not the be-all and end-all of the matter.  *See Fernandez*, 286 F.3d at 1078 ("The specific question before us is whether the circumstances of the prosecutor's challenges 'raise an inference' of exclusion based on race, such that inquiry into the prosecution's motives is required under *Batson*.  A pattern of exclusionary strikes is not necessary for finding an inference of discrimination."); *see also United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994) ("To establish a *prima facie* case, Vasquez-Lopez did not need to show that the prosecution had engaged in a pattern of discriminatory strikes against more than one prospective juror.  We have held that the Constitution forbids striking even a single prospective juror for a discriminatory purpose.").

immediately after the prosecutor's exercise of her 14th strike (her 9th strike of a prospective juror with a Spanish surname), and there was a bench discussion had off the record at that point.  (12 ART at 131.)  It is possible that defense counsel raised the *Batson* motion (or perhaps renewed it) at that time, but even then, the statistical disparity (9 out of 14) was clearly sufficient to raise an inference of discrimination.  Thus, consideration of the possible timings of petitioner's *Batson* motion does not in any way serve to dispel the inference raised by the statistical disparities in this case.

Second, although the trial jury selected in petitioner's case ultimately included two jurors with Spanish surnames (No. 35 and No. 54), this fact weighs only nominally against an inference of discrimination given the timing of when these two jurors were added to the venire panel and were available to be the subject of peremptory challenges by the parties.  *See Shirley*, 807 F.3d 1102 ("That one black juror was eventually seated does weigh against an inference of discrimination, but 'only nominally' so."); *cf. Cooperwood*, 245 F.3d at 1047–48 (the prosecutor's challenge to African-American male candidate did not establish *prima facie* case of discrimination where the final panel had two African-American panelists, three Asian-Americans and one Pacific Islander).  Notably, here juror No. 35 was added to the reconstituted jury after the second round of peremptory challenges were made and thus was not even available as the subject of a potential strike until the third round of challenges.  During that third round, the panel consisted of 21 prospective jurors (three with Spanish surnames) and the prosecutor struck two of them.  In other words, juror No. 35 was the sole remaining juror with a Spanish surname on the panel at that point.  In this context, the fact that prosecutor elected not to strike juror No. 35 does little to dispel the inference of bias in her exercise of peremptory strikes in this case.  Similarly, juror No. 54 was added to the reconstituted jury after the third round of peremptory challenges and thus was not available for a potential strike until the last round, during which the prosecutor used three of her four last strikes on prospective jurors with Spanish surnames, and it appears from the record that defense counsel had made a *Batson* motion by then.  In this context as well, the fact that the prosecutor chose not to strike juror No. 35 and juror No. 54 at that point does not

/////

21

serve to meaningfully dispel the inference of bias.[11]  *See Fernandez*, 286 F.3d at 1079 (noting that while the prosecutor's acceptance of minority jurors is relevant, less weight is afforded to this circumstance where the prosecutor is essentially put on notice or warned that additional strikes of members of that protected group may trigger a finding of a *prima facie* showing of discrimination).

Third, another circumstance that courts consider is whether the prosecutor's questions and statements during voir dire show that the prosecutor engaged in meaningful questioning of the minority jurors before striking them.  *See Collins*, 551 F.3d at 921.  A close review of the voir dire record in this case reflects that the prosecutor engaged in meaningful questioning with some, but not all, of the ten prospective jurors with Spanish surnames before she struck them.  The prosecutor's statements and questions with regard to each of those stricken prospective jurors with Spanish surnames are summarized as follows.

### Prospective Juror No. 8 – (1st strike)

The record reflects that the prosecutor engaged in meaningful questioning with prospective juror No. 8, who had expressed that his father had a bad experience with "a cop."  (13 ART at 31.)  The prosecutor asked if he would be able to put aside that bad experience and sit fairly and impartially on the jury, and prospective juror No. 8 answered that he could, and that he has known "good cops," but that this experience with "one bad cop" was still in the back of his mind.  (*Id.*)

### Prospective Juror No. 1 – (3rd strike)

The record reflects that the prosecutor engaged in meaningful questioning with prospective juror No. 1, who had been arrested on a misdemeanor child endangerment charge.  (13 ART at 30.)  The prosecutor asked if there was anything about that process and the way she was treated by the police officers that made her feel that she could not be impartial.  (*Id.*)  Prospective juror No. 1 answered, no, that they had treated her well.  (*Id.*)  The prosecutor also

---

[11]  For similar reasons, because counsel agreed on alternate jurors after petitioner had made his *Batson* motion, the fact that the prosecutor agreed upon an alternate juror who had a Spanish surname does not serve to dispel the inference of racial bias raised by the statistical disparities in this case.

asked if there was anything about the legal process that she felt she was treated unfairly, to which she also answered, no.

**Prospective Juror No. 15 – (4th strike)**

The record reflects that the prosecutor did not engage in meaningful questioning with prospective juror No. 15 before exercising a peremptory challenge on her.  Following an exchange with another prospective juror regarding rape victims' reactions and how not all victims react the same way, the prosecutor turned to prospective juror No. 15 and had the following exchange:

> [Prosecutor]:  [I]f you saw a rape victim testify and they did not cry on the stand, they did not fall apart on the stand, are you going to say, well, I can't believe anything she says?
>
> Prospective juror No. 15:  Nods.
>
> [Prosecutor]:  No?  Okay.  So how a rape victim reacts is very different.

(13 ART at 23.)[12]  This was the only question that the prosecutor asked prospective juror No. 15, and the question was not specific to her experience or asked as a follow-up to answers she had

---

[12]  The Fifth DCA characterized prospective juror No. 15's response as "ambiguous," and concluded that "[b]ecause the juror's response was ambiguous and the prosecutor's follow up did not yield any clarification, the prosecutor could reasonably be concerned that the juror would be more likely than others to disbelieve an unemotional victim witness."  *Arciga*, 2014 WL 1400962, at \*4.  The Fifth DCA further speculated that "[i]f the juror failed to understand the question, the prosecutor might reasonably have been concerned about the juror's possible lack of attentiveness."  *Id.*  However, because the prosecutor's follow-up was "*No*?  Okay"—not "*Yes*? Okay"—the ambiguity in the record is whether or not the prosecutor had interpreted the "nods" response as an affirmative yes to her question.  To the extent that prospective juror No. 15's nod was ambiguous and actually caused the prosecutor to have some doubt or concern, the prosecutor could have followed up by rephrasing her question, asking another question to clarify, or asking for a verbal response.  (For example, when the prosecutor asked a prospective juror, "[h]ow a child retells an experience is often very different than how an adult would; is that correct," the prospective juror answered "uh-huh," to which the prosecutor immediately followed-up with "[i]s that a yes," and that prospective juror answered "yes." (13 ART at 26.))  Instead, with juror No. 15 the prosecutor immediately pivoted to a different prospective juror and asked, "do you understand that," and that prospective juror answered "yes." (13 ART at 23.)  The prosecutor then asked another prospective juror, "do you understand that question, too, about the rape victim, every rape victim reacts differently," and that prospective juror answered with a nod.  (*Id.*)  Given this context of the prosecutor's brief exchange with prospective juror No. 15, that exchange clearly was not meaningful questioning and hardly indicated that prospective juror No. 15 was inattentive or more likely to disbelieve an unemotional victim witness.

given in response to the court's questions.  Moreover, the prosecutor asked several other prospective jurors this question as a means of conveying the general concept that rape victims react differently and vary in their presentation of emotion.  (*See* 13 ART at 21–27.)  Accordingly, the record reflects that although the prosecutor asked prospective juror No. 15 a question, the context reveals that this was not meaningful questioning of prospective juror No. 15 in particular.

**Prospective Juror No. 32 – (5th strike)**

The record reflects that the prosecutor engaged in meaningful questioning with prospective juror No. 32, who had expressed her reluctance to judge another person because she has a hard time judging others.  (13 ART at 45, 80.)  The prosecutor followed-up with prospective juror No. 32 on her answers to questions posed by the court and by defense counsel regarding her reluctance in this regard.  (13 ART at 88–89.)  The prosecutor stated:  "I think you're somebody who talked about credibility, and I think sometimes people believe that we're judging the person, and you understand that we're just judging the conduct of the defendant, sometimes nice people do bad things, and all you need to judge is the conduct."  (*Id.*)  The prosecutor then asked:  "Does that make you feel better sitting as a juror or do you still feel like it's just too hard, it will drive you crazy and you just can't be a juror?"  (*Id.*)  Prospective juror no. 32 answered:  "I think I can."  (*Id.*)

**Prospective Juror No. 28 – (7th strike)**

The record reflects that the prosecutor did not engage in any meaningful questioning of prospective juror No. 28.  The prosecutor explained that "circumstantial evidence was just as good as direct evidence" and gave an example of circumstantial evidence that could be used to show that it is raining outside.  (13 ART at 83.)  The prosecutor then asked prospective juror No. 28, "do you understand circumstantial evidence," to which prospective juror No. 28 answered, "yes, I do."  (*Id.*)  To reiterate her point, the prosecutor then asked prospective juror No. 28, "can you follow the law that says circumstantial evidence is just as good as direct evidence," to which prospective juror No. 28 answered "yes."  (*Id.*)  Then, the prosecutor turned to the panel and asked, "does anybody have an issue with circumstantial evidence?"  (*Id.*)  This exchange suggests that the prosecutor asked prospective juror No. 28 this question merely to demonstrate a point

about circumstantial evidence for the entire panel.  These two circumstantial evidence questions were the only questions that the prosecutor asked prospective juror No. 28.  Thus, the prosecutor's questions do not constitute meaningful questions specific to prospective juror No. 28.

**Prospective Juror No. 25 – (8th strike)**

The record reflects that the prosecutor engaged in meaningful questioning of prospective juror No. 25, who worked as an accountant and stated that his father was once arrested for possession of narcotics for sale.  (13 ART at 65–66.)  While questioning prospective juror No. 32 regarding his occupation, the court commented that accounting is a very precise field.  (13 ART at 66.)  Later, the prosecutor referred back to the court's comment and asked prospective juror No. 25, "are you okay with holding the People to the standard of beyond a reasonable doubt versus possible doubt," to which he responded, "[y]eah, you know, as long as they explain everything totally and everything, you know, the way we could understand it [to] be able to know what's - - you know."  (13 ART at  85.)  The prosecutor then had the following exchange with prospective juror No. 25:

> [Prosecutor]:  "Okay.  Here's the concern, you're an accountant, my brother is an accountant, and I know how particular he is about - - everything has got to lineup just right, and if it doesn't he just says, oh, no, because this doesn't make sense because this little number is off or something is off, and I think it's a personality thing when you're an accountant.  Are you going to - - and that's because you want beyond all doubt.  You're going to recalculate figures until it comes out exactly right.  That's not the way that human nature is, that's not the way that it works here with the evidence.  Are you going to be able to put that aside and say beyond a reasonable doubt versus possible doubt?
>
> Prospective juror No. 25:  Yes, because I don't apply what I do at work to my everyday life.  I try to leave that at work.
>
> [Prosecutor]:  That's good.
>
> Prospective juror No. 25:  When I go to work I put that mindset on, when I leave work I turn it off.
>
> [Prosecutor]:  Okay.  So you'll be able to follow the instructions, great.
>
> Prospective juror No. 25:  Uh-huh.

25

1  (13 ART at 85–86.)  The prosecutor also followed-up regarding prospective juror No. 25's

2  father's arrest, asking if there was anything about the way that law enforcement treated his father

3  or the legal process that bothered prospective juror No. 25, to which he answered no.  (13 ART at

4  86–87.)

5  **Prospective Juror No. 41 – (9th strike)**

6  The record reflects that the prosecutor engaged in meaningful questioning with

7  prospective juror No. 41, who had stated that he was currently being charged with a felony in

8  Madera County and that he did not feel that the prosecutor in his case was treating him fairly.  (13

9  ART at 105.)  The prosecutor followed-up with prospective juror No. 41 and asked, "does that

10 mean that you cannot sit here fairly and impartially because I'm a district attorney," to which he

11 answered, no.  (12 ART at 95.)  The prosecutor then asked if prospective juror No. 41 could sit

12 fairly and impartially on this jury and if he understands that she is not the district attorney in

13 Madera County and knows nothing about his case there.  (*Id.*)  Prospective juror No. 41 answered

14 yes to both questions.  (*Id.*)  The prosecutor also asked prospective juror No. 41 about his "work

15 in corrections" as a "correctional supervising cook," confirming with him that he was not a

16 correctional officer, and that he did not have interactions with the inmates telling him about their

17 cases.  (12 ART at 94–95.)

18 **Prospective Juror No. 46 – (13th strike)**

19 The record reflects that the prosecutor engaged in some limited questioning with

20 prospective juror No. 46, who stated that she was a special education teacher.  (12 ART at 111.)

21 The prosecutor had the following exchange with prospective juror No. 46:

22 [Prosecutor]:  What ages do you teach?

23 Prospective juror No. 46:  It is elementary, so I can teach kids
24 anywhere that can be from kindergarten to sixth grade.

25 [Prosecutor]:  And do you ever have a situation where maybe one
   of the kids is telling a false story?

26 Prospective juror No. 46:  All the time.

27 [Prosecutor]:  And you do that by asking follow-up questions,
28 correct?

Prospective juror No. 46:  Yes.

[Prosecutor]:  And then seeing what rings true and what is not true?

Prospective juror No. 46:  Yes.

[Prosecutor]:  And sometimes that is true for adults.  Sometimes people lie; is that correct?

Prospective juror No. 46:  Yes.

[Prosecutor]:  So do you feel like you would be a good judge of credibility in determining whether a witness appears to be telling the truth that you believe something beyond a reasonable doubt?

Prospective juror No. 46:  Yes.

(12 ART at 122–123.)  In context, the record suggests that this line of questioning was not directed at prospective juror No. 46 in particular, but rather the prosecutor used these questions to facilitate making her own broader point to the venire about evaluating the credibility of witnesses and evidence.  Accordingly, while perhaps arguably a somewhat closer call, the record does not reflect that the prosecutor engaged in any meaningful questioning of prospective juror No. 46.

**Prospective Juror No. 48 – (14th strike)**

The record reflects that the prosecutor engaged in meaningful questioning with prospective juror No. 48, who stated that he had been arrested 33 years ago but that no criminal charges were filed as a result.  (12 ART at 110.)  The prosecutor followed-up with prospective juror No. 48 as follows:

[Prosecutor]:  Mr. [], you said that no charges were filed.  The judge said, "Did you feel like you were treated fairly?"  To me, it seemed like you kind of hesitated a little bit.  Was there any issues with the officers?

Prospective juror No. 48:  It is just that - - I - - it was just - - how could I - - a sweep? [sic].  I tried to explain to the officer I didn't have anything to do with it, and still said "Let's go."

[Prosecutor]:  Okay.

Prospective juror No. 48:  I was arrested.

[Prosecutor]:  But no charges were filed?

Prospective juror No. 48:  No.

27

[Prosecutor]:  From what it sounds like, initially, they thought you were involved; then they found out you weren't, so they let you go?

Prospective juror No. 48:  Yes.

[Prosecutor]:  Were the officers rude to you?

Prospective juror No. 48:  Yeah.  They were rude.

[Prosecutor]:  You understand that the officers in this case are not going to be the officers that arrested you?

Prospective juror No. 48:  I understand.

[Prosecutor]:  Anybody, cops, lawyers, service people can be rude sometimes, but you have to look at the evidence.  Will you be able to do that?

Prospective juror No. 48:  I think I can.

(12 ART at 124–25.)

**Prospective Juror No. 56 – (15th strike)**

The record reflects that the prosecutor did not engage in meaningful questioning of prospective juror No. 56.  Indeed, the record reflects that the prosecutor did not ask any questions of prospective juror No. 56 at all.

In sum, the prosecutor engaged in meaningful questioning of only six of the ten prospective jurors with Spanish surnames (Nos. 1, 8, 25, 32, 41 and 48) before exercising peremptory challenges to strike them.  In this regard, the prosecutor did not meaningfully question three of the stricken prospective jurors with Spanish surnames (Nos. 15, 28, and 46).  Moreover, the prosecutor did not ask *any* questions of prospective juror No. 56, whom she struck last.

Given these circumstances, consideration of the prosecutor's statements and questions posed to the perspective jurors stricken by the prosecution does not weigh heavily in either direction—to support or to dispel the existing inference of bias in the exercise of the prosecution's peremptory challenges.  For example, this is not a situation in which the prosecutor struck prospective jurors with Spanish surnames without asking any of them meaningful questions during voir dire, which would strongly support an inference of bias.  *See Fernandez*, 286 F.3d at 1079 (*prima facie* case shown in part because "the prosecutor failed to engage in

28

meaningful questioning of *any* of the minority jurors") (emphasis added).  This is also not a situation in which the prosecutor asked meaningful questions before striking all of the prospective jurors with Spanish surnames, which would weigh against an inference of bias arising from statistical disparity.  *See White v. Pollard*, No. 2:20-cv-06726-GWM-AA, 2021 WL 6620853, at *31 (C.D. Cal. Sept. 3, 2021), *report and recommendation adopted*, 2022 WL 195494 (C.D. Cal. Jan. 18, 2022) (concluding that "this is not a case where an inference of racial motivation can be drawn from the prosecutor's failure to elicit meaningful information from Juror No. 24 before excusing her" because "[b]efore excusing Juror No. 24, the prosecutor asked her pertinent questions about her views of the criminal justice system and about her work with people with behavioral disabilities") (internal citations omitted).  Thus, the court finds that consideration of this factor to be neutral at best.  That the prosecutor in this case asked some meaningful questions to some of the prospective jurors with Spanish surnames before striking them certainly does not serve to dispel the inference of bias existing in this case.  *See United States v. Esparza-Gonzalez*, 422 F.3d 897, 905 (9th Cir. 2005) ("Although the prosecutor has no obligation to question all potential jurors, his failure to do so prior to effectively removing a juror of a cognizable group through a waiver may contribute to a suspicion that this juror was removed on the basis of race. This suspicion, along with other factors, may lead to an inference of intentional discrimination.").

Moreover, while the answers and responses given by the prospective jurors who were meaningfully questioned by the prosecutor may suggest non-discriminatory reasons that the prosecutor *might* have had for striking them, that is simply not a consideration in the *Batson* framework.  *See Johnson*, 545 U.S. at 172 (quoting *Paulino*, 371 F.3d at 1090) ("[I]t does not matter that the prosecutor might have had good reasons . . . [;] [w]hat matters is the real reason they were stricken."); *see also Potts v. Harman*, 588 F. App'x 620, 620 (9th Cir. 2014)[13] ("[T]he state court was not entitled to speculate as to potential non-discriminatory reasons that the prosecutor may have had for excusing the juror."); *cf. United States v. Santos-Cordero*, 669 F.

---

[13]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1   App'x 417, 418 (9th Cir. 2016)[14] (holding that "the district court erred by relying on its own

2   speculation about the prosecutor's potential reasons for striking the juror when it concluded that

3   a *prima facia* showing of discrimination had not been made at step one").  Reflecting on the

4   *Batson* framework, the Supreme Court has explained:

> [i]t is true that peremptories are often the subjects of instinct, and it
> can sometimes be hard to say what the reason is.  But when
> illegitimate grounds like race are in issue, a prosecutor simply has
> got to state his reasons as best he can and stand or fall on the
> plausibility of the reasons he gives.  A *Batson* challenge does not
> call for a mere exercise in thinking up any rational basis.  If the
> stated reason does not hold up, its pretextual significance does not
> fade because a trial judge, or an appeals court, can imagine a reason
> that might not have been shown up as false.

10  *Miller-El II*, 545 U.S. at 252 (internal citation omitted).

11          Fourth, and finally, courts conduct a comparative juror analysis and consider whether such

12  a comparison of the prospective jurors stricken by the prosecutor with the jurors permitted to

13  serve dispels an inference of discrimination.  *See id*. at 241 ("If a prosecutor's proffered reason

14  for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted

15  to serve, that is evidence tending to prove purposeful discrimination.")  Comparative juror

16  analysis is a useful tool and a relevant circumstance, even at *Batson* step one.  *See Boyd*, 467 F.3d

17  at 1149.  This "analysis involves 'side-by-side comparisons' between the [minority] prospective

18  juror who was excused and non-minority jurors who were allowed to serve."  *White*, 2021 WL

19  6620853, at *30 (quoting *Miller-El II*, 545 U.S. at 241).  "An inference of discrimination may

20  arise when two or more potential jurors share the same relevant attributes but the prosecutor has

21  challenged only the minority juror."  *Collins*, 551 F.3d at 922.

22          Here, a comparative juror analysis in this case is somewhat hampered because the state

23  trial court did not require the prosecutor to state her reasons for striking the ten prospective jurors

24  with Spanish surnames, nor did the prosecutor elect to put her reasons on the record

25  notwithstanding the trial court's ruling on the petitioner's *Batson* motion.  Thus, the record in this

26  case does not allow for comparison of the reasons given *by the prosecutor* for the potentially

27

28  [14]  See fn. 13, above.

1   discriminatory strikes to determine whether those reasons would apply equally to jurors of

2   another race who were not struck by the prosecutor.  The Fifth DCA identified its own "adequate

3   reasons other than racial discrimination for each challenge," but in doing so, also did not conduct

4   a comparative juror analysis to determine whether those reasons would similarly apply to jurors

5   who the prosecutor did not challenge.  *Arciga*, 2014 WL 1400962, at *4.

6          In reviewing the record of voir dire of all prospective jurors, not just those stricken by the

7   prosecutor, the undersigned observes that at least some of the reasons suggested by the Fifth DCA

8   for why jurors might have been struck by the prosecutor are reasons that would have also applied

9   in equal force to jurors who ended up being selected and serving on the jury.  For instance, the

10  Fifth DCA suggested that a juror's lower education level might have provided a race-neutral

11  reason for striking prospective jurors Nos. 1 and 28.  *Arciga*, 2014 WL 1400962, at *4–5.  Both

12  had Spanish surnames and had no more than a high school education—prospective juror No. 1

13  completed the tenth grade of high school (12 ART at 65), and prospective juror No. 28 completed

14  a GED (13 ART at 70).  However, juror No. 33, who was selected to serve on the jury and who

15  did not have a Spanish surname, also had only a high school level education.  (12 ART at 119.)

16  Moreover, the prosecutor struck Spanish-surnamed prospective juror No. 56 (notably without

17  asking him any questions at all), and he had a Bachelor of Arts degree.  (12 ART at 121.)  The

18  prosecutor also exercised a peremptory challenge on Spanish-surnamed prospective juror No. 15

19  (without asking her any meaningful questions), and her educational background included

20  postgraduate work.  (12 ART at 78.)

21         Similarly, the Fifth DCA pointed to the fact that Spanish-surnamed prospective jurors No.

22  28 and 46 did not have children as a reason for striking them.  *Arciga*, 2014 WL 1400962, at *4–

23  5.  However, juror No. 49 also had no children and was selected to serve on the jury at

24  petitioner's trial (12 ART at 115), as did juror No. 17, (12 ART at 81).  Neither juror No. 49 nor

25  juror No. 17, however, had Spanish surnames.

26         In another example, the Fifth DCA pointed to the fact that Spanish-surnamed prospective

27  juror No. 32 had a brother who had been arrested and spent a few nights in jail for driving under

28  the influence, and the state appellate court concluded that this "experience of a family member

being arrested and incarcerated" could be the reason for the prosecution's exercise of a peremptory challenge striking prospective juror No. 32.  *Arciga*, 2014 WL 1400962, at *5. However, juror No. 33, who served on the jury and did not have a Spanish surname, had a brother who had been incarcerated for the past ten years—much longer than just a few nights in jail for a DUI.  (13 ART at 56.)  It is not clear from the record when prospective juror No. 32's brother was arrested for a DUI, but it is notable that juror No. 37, who served on the jury and did not have a Spanish surname, also had a brother who had suffered a DUI conviction, albeit twenty years earlier.  (13 ART at 105.)  Both jurors No. 33 and 37, and prospective juror No. 32, all confirmed that they each felt their brothers were treated fairly by the criminal justice system and that their experiences in this regard would not affect their ability to serve as a fair and impartial juror in petitioner's case.  (13 ART at 56, 60, 105.)

In yet another example, the Fifth DCA posited that an adequate reason for the prosecutor to strike Spanish-surnamed prospective juror No. 56 could have been that juror No. 56 would likely resent and mistrust police officers because he had been "detained" (but not arrested) during an incident five months earlier in Los Angeles, in which he was pulled over and had to sit in the back of a squad car while officers looked through his wallet.  *Arciga*, 2014 WL 1400962, at *6. When twice asked by the court if anything about this experience would affect his ability to be fair and impartial, the perspective juror answered:  "No.  Left me kind of upset," and "I hope not." (12 ART at 109–10.)  When the court asked if he would do his best to set the incident aside, he answered, "yeah," and the court stated that it "will let the attorneys inquire."  (12 ART at 110.) Notably, the prosecutor did not ask prospective juror No. 56 any questions (about this incident or otherwise).  In contrast, juror No. 40, who served on the jury at petitioner's trial and did not have a Spanish surname, had been arrested and formally charged in a criminal case twenty years ago. (13 ART at 103–105.)  Juror No. 40 told the court that his ability to be fair and impartial would not be affected, yet the prosecutor nevertheless followed-up with a few questions of her own, to confirm that there was nothing about the "court system" that concerned juror No. 40 and that he could sit as a juror fairly and impartially.  (13 ART at 103–105; 12 ART at 96.)

/////

1   As these many examples illustrate, a comparative analysis of the prospective jurors who

2   were stricken by the prosecutor with the jurors who were selected to serve on the jury tends to

3   support, rather than dispel, an inference of bias in the prosecution's exercise of peremptory

4   challenges in this case.

5   Having analyzed other relevant considerations and reviewed the totality of the

6   circumstances, this court concludes that petitioner has made a *prima facie* showing of racial

7   discrimination in the prosecutor's exercise of peremptory challenges.  That is, petitioner has

8   "satisfie[d] the requirements of *Batson*'s first step by producing evidence sufficient to permit the

9   trial judge to draw an inference that discrimination has occurred."  *See Johnson*, 545 U.S. at 170.

10   b.   Batson *Step Two – Prosecutor Articulates Actual Reasons for the Strikes*

11   Here, because the state trial court erroneously concluded that petitioner had not produced

12   evidence sufficient to raise an inference of racial bias, the trial court did not require the prosecutor

13   to articulate her reasons for striking the ten prospective jurors who had Spanish surnames.

14   Accordingly, the court must now proceed "to conduct an evidentiary hearing, in order to replicate

15   on habeas review the inquiry that the state trial court should have conducted in the first place—

16   requiring the prosecutor to assert race-neutral reasons for the strike (at *Batson* step two) and

17   determining (at *Batson* step three) whether the asserted reasons were in fact genuine rather than

18   pretextual."  *Finn*, 665 F.3d at 1072; *see also Potts*, 588 F. App'x at 620 (reversing a district

19   court's denial of habeas relief and remanding for an evidentiary hearing on the petitioner's *Batson*

20   claim, noting that "[a]t *Batson*'s first step, the state court was not entitled to speculate as to

21   potential non-discriminatory reasons that the prosecutor may have had for excusing the juror")

22   (citing *Paulino v. Harrison*, 542 F.3d 692, 699–700 (9th Cir. 2008)).

23   Because an evidentiary hearing will be necessary in order to appropriately resolve

24   petitioner's *Batson* claim, the court will refer the pending petition to the Federal Defender's

25   Office for appointment of counsel on behalf of petitioner in this federal habeas action.  *See Kitlas*

26   *v. Haws*, No. 2:08-cv-6651-GHK-LAL, 2016 WL 8722641, at *2 (C.D. Cal. May 13, 2016),

27   *report and recommendation adopted*, 2016 WL 8732524 (C.D. Cal. Sept. 23, 2016), *aff'd*, 736 F.

28   App'x 158 (9th Cir. 2018) ("appoint[ing] the Federal Public Defender to represent Petitioner"

1  after determining that an evidentiary hearing on petitioner's *Batson* claim would be held).  Once

2  counsel is appointed, the parties are directed to contact Courtroom Deputy Mamie Hernandez to

3  determine the court's availability for a status conference at which time an evidentiary hearing will

4  be scheduled and the procedure to be employed at the evidentiary hearing (such as the filing of

5  declarations in lieu of direct examination, etc.) may be discussed.

6  **B.     Petitioner's Insufficient Evidence Claims**

7         As to petitioner's remaining two grounds for federal habeas relief based on claims of

8  insufficient evidence, the pending findings and recommendations recommend that petitioner's

9  claims be denied on the merits.  (Doc. No. 30 at 20–22.)  Specifically, the magistrate judge

10  concluded that the Fifth DCA "reasonably found that there was more than sufficient evidence

11  supporting the [jury's] finding[s]" as to the substantive offense of kidnapping with intent to rape,

12  the special circumstance of kidnapping of M.F., and as to the substantive offense of attempted

13  kidnapping of C.M.  (*Id.* at 20.)  The undersigned agrees.

14         In his objections to the pending findings and recommendations as to his insufficient

15  evidence claims, petitioner merely restates the arguments he presented in his petition—arguments

16  that the magistrate judge has already thoroughly and correctly addressed in the pending findings

17  and recommendations.  Having carefully reviewed the entire file, including petitioner's

18  objections, the undersigned concludes that the findings and recommendations with regard to

19  petitioner's insufficient evidence claims are supported by the record and by proper analysis.

20  Accordingly, the undersigned will adopt the pending findings and recommendations in part as to

21  those claims and deny petitioner's second and third claims for federal habeas relief on the merits.

22  Therefore, this federal habeas action will now proceed only on petitioner's first claim for federal

23  habeas relief—his *Batson* claim.

24                                   **CONCLUSION**

25         For all of the reasons explained above:

26         1.     The pending findings and recommendations issued on June 26, 2017 (Doc. No. 30)

27                are adopted in part and declined in part, as follows:

28  /////

34

                a.        Petitioner's application for a writ of habeas corpus based on his claims of insufficient evidence to support his judgment and conviction is denied; and

                b.        Petitioner's application for a writ of habeas corpus proceeds only on his *Batson* claim, which remains pending;

2.       Petitioner's pending application for a writ of habeas corpus is hereby referred to the Federal Defender's Office ("FDO") for the appointment of counsel on behalf of petitioner;

3.       Following the appointment of counsel, the parties are directed to contact Courtroom Deputy Mamie Hernandez, at (559) 499-5652, or MHernandez@caed.uscourts.gov, within twenty-one (21) days of service of this order regarding the scheduling of a status conference regarding the setting of an evidentiary hearing on petitioner's *Batson* claim and the procedures governing that hearing; and

4.       The Clerk of the Court is directed to include Assistant Federal Defenders Ann McClintock (Ann_McClintock@fd.org) and Carolyn Wiggin (Carolyn_Wiggin@fd.org) in the CM/ECF's Notice of Electronic Filing in this action.

IT IS SO ORDERED.

Dated:   **June 15, 2022**                            *Dale A. Drozd*

                                         UNITED STATES DISTRICT JUDGE